In the Matter of the Complaint of TA CHI NAVIGATION (PANAMA) CORP., S.A., as Owner of the S.S. EURYPYLUS for Exoneration from or Limitation of Liability.

No. 75 Civ. 5994 (CHT).

United States District Court,
S.D. New York.

Oct. 26, 1983.

Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito, New York City, for petitioner; Vincent Barra, James E. Ryan, New York City, of counsel.

Hill, Rivkins, Carey, Loesberg & O'Brien, New York City, for Various Cargo Claimants; Joseph M. Mangino, Keith B. Dalen, New York City, of counsel.

Donovan, Maloof, Walsh & Kennedy, New York City, for claimant, third-party plaintiff Citibank, N.A.; Charles C. Goodenough, New York City, of counsel.

## OPINION

TENNEY, District Judge.

This is an action brought by a shipowner, Ta Chi Navigation (Panama) Corp., S.A. ("Ta Chi"), for exoneration of its steamship S.S. EURYPYLUS under the Fire Statute of the United States, 46 U.S.C. § 182 (1976), or for limitation of damages under 46 U.S.C. § 183. Furthermore, the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. §§ 1300 *et seq.*, is also relevant since the bills of lading for the cargo incorporated that statute. The action arose out of an explosion and massive fire aboard S.S. EURYPYLUS on November 10, 1975 while the vessel was on the high seas proceeding from Taiwan around the world. The explosion and fire resulted in the deaths of or injury to certain officers and members of the crew and in substantial cargo loss or damage. After a nonjury trial, the Court filed a lengthy opinion in which it denied the petition for exoneration or limitation. *Complaint of Ta Chi Navigation (Panama) Corp., S.A.*, 504 F.Supp. 209 (S.D.N.Y. 1980). On appeal, the Court of Appeals for the Second Circuit reversed this Court's denial of the petition and remanded the case for further proceedings consistent with its opinion. *Complaint of Ta Chi Navigation (Panama) Corp., S.A.*, 677

F.2d 225 (2d Cir.1982). The court of appeals held that this "court erred in fixing the elements and burden of proof," *id.* at 226, due to "a misunderstanding of the terms of the Fire Statute as they have been applied by the Supreme Court and the courts of this Circuit." *Id.* at 228.[1]

■ Certain portions of this Court's opinion which the appellate court found objectionable are set out below. The court quoted the portions hereinafter underlined. 677 F.2d at 227–28.

*In a proceeding for exoneration from, or limitation of, liability* (as is the present proceeding) the petitioner is required to prove that the vessel was seaworthy at the commencement of the voyage *and to set forth facts known to it which might have a bearing on the cause of loss. The cargo claimants have the burden of proof of establishing either unseaworthiness or negligence causally related to the loss or damage. If such unseaworthiness or negligence is established the petitioner must then show that it is entitled to limitation or exoneration because of a lack of privity or knowledge as to the condition of unseaworthiness or negligence. In re Marine Sulphur Transport Corp.*, 312 F.Supp. 1081, 1092 (S.D.N.Y.1970), *aff'd in part, rev'd in part sub nom. In re Marine Sulphur Queen*, 460 F.2d 89 (2d Cir.1972) (The Marine Sulphur Queen). If the petitioner failed to use due and proper care, *i.e.,* due diligence, to provide a competent master and crew and to see that the ship was seaworthy at the commencement of the voyage, then any loss occurring by reason of fault or neglect in these particulars is within its privity, and it may not avail itself of the fire exemption statutes. *Tug Ocean Prince Inc. v. United States*, 584 F.2d 1151, 1155 (2d Cir.1978) (Tug

---

1. In its prior opinion this Court noted that "[i]n cases involving the fire exemption statutes the allocation of burden of proof has been somewhat confused by the type of action, the order of proof, and the nature of the causal unseaworthiness." 504 F.Supp. at 229. The Court is not alone in this conclusion. *See* G. GILMORE & C. BLACK, THE LAW OF ADMIRALTY § 10–25 (2d ed. 1975). "There is no reason why the allocation of the burden of proof should be different in Fire Statute cases from the universally accepted allocation in Limitation Act cases." *Id.* at 896.

Ocean Prince); *The Gladiola, supra,* 603 F.2d [1327] at 1341 [ (9th Cir.1979) ]. Conversely, if petitioner did exercise the due diligence mandated by § 1303, then the burden falls on claimants to show that the damage was due to the personal "design or neglect" or "fault or privity" of the petitioner. *Complaint of Caldas,* 350 F.Supp. 566, 573 (E.D.Pa.1972), *affirmed without opinion sub nom. Appeal of Coldemar Line,* 485 F.2d 678 (3d Cir.1973).

In the instant case we are concerned with whether the carrier had exercised due diligence under § 1303 before and at the commencement of the voyage to make S.S. EURYPYLUS seaworthy, to properly man, equip, and supply her, and to make her holds fit and safe for the reception, carriage, and preservation of cargo.

504 F.Supp. at 229–30 (emphasis in original).

The first two portions quoted by the appellate court were intended to apply to petitioner's prima facie case in a limitation proceeding.[2] Concededly they would appear to run counter to the prevailing law in this circuit in Fire Statute cases. (The last portion quoted does not deal with the burden of proof.) What this Court failed to recognize is that, while in limitation proceedings under 46 U.S.C. § 183(a) the burden is on the shipowner to prove that the unseaworthiness was without its privity or knowledge, *Coryell v. Phipps,* 317 U.S. 406, 409, 63 S.Ct. 291, 292, 87 L.Ed. 363 (1943); *In re Marine Sulphur Queen, supra,* 460 F.2d at 101, in limitation proceedings involving the Fire Statute, the burden, at least in this circuit, is on the cargo

claimants to prove that the fire was "caused by the design or neglect of such owner."[3] This is apparently so even if the shipowner makes no prima facie case of due diligence under 46 U.S.C. § 1303(1).

The error committed by this Court in its previous decision appears in the second sentence of the following language:

> The cargo claimants have the burden of proof of establishing either unseaworthiness or negligence causally related to the loss or damage. If such unseaworthiness or negligence is established the petitioner [carrier] must then show that it is entitled to limitation or exoneration because of a lack of privity or knowledge as to the condition of unseaworthiness or negligence.

504 F.Supp. at 229–30 (emphasis added) (citations omitted).

In reversing and remanding, the appellate court stated:

> We adhere to our prior holdings that, if the carrier shows that the damage was caused by fire, the shipper must prove that the carrier's negligence caused the fire or prevented its extinguishment. If on remand the shipper fails to meet this burden, the action must be dismissed. Only if the shipper sustained the burden would the carrier have the obligation to establish what portion of the damages was not attributable to its fault.

677 F.2d at 229 (citation omitted).

■ Although no mention of the burden of proof as to "privity or knowledge" of the shipowner, *see* 46 U.S.C. § 183(a), was made by the appellate court, this Court must assume that the burden of proof as to privity or knowledge was considered as

---

**2.** The language quoted by the court of appeals was derived from *Asbestos Corp. Ltd. v. Compagnie De Navigation Fraissinet Et Cyprien Fabre,* 345 F.Supp. 814 (S.D.N.Y.1972), *aff'd,* 480 F.2d 669 (2d Cir.1973), where the district court stated: "The initial issue on liability here is whether the defendant exercised due diligence before and at the beginning of the voyage to make the ship seaworthy so that the vessel was properly equipped and possessed adequate fire fighting equipment to fight an engine room fire." *Id.* at 816 (footnote omitted).

**3.** The Fire Statute, 46 U.S.C. § 182, provides in full that:

> No owner of any vessel shall be liable to answer for or make good to any person any loss or damage, which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner.

part of the burden of proving "the carrier's negligence." *See G. Gilmore & C. Black, supra,* at 879. The carrier cannot be liable for fire loss due to negligence or unseaworthiness without its privity or knowledge. *Id.*

## PRIMA FACIE CASE

This Court's statement that "the petitioner is required to prove that the vessel was seaworthy at the commencement of the voyage," 504 F.Supp. at 229, was directed to the prima facie case commonly made in limitation proceedings and tracks petitioner's pleadings. In its *petition for exoneration or limitation,* the *shipowner* alleged in part as follows:

SECOND: At all times hereinafter mentioned the S/S EURYPYLUS was a steam vessel, 151.49 meters long, 19.33 meters in beam, of 8,601 gross and 4,419 net tons. The vessel was built in Port Glasgow in the year 1959. She was registered under the laws of Panama and her home port was Panama, R.P. She held the highest classification for hull, machinery and tackle in Lloyd's. Complainant used due diligence to make the S/S EURYPYLUS seaworthy, and at the time of the loss hereinafter described and at and prior to the commencement of the voyage upon which said loss, injuries and deaths occurred the S/S EURYPYLUS was tight, staunch, strong, properly manned, equipped and supplied and in all respects seaworthy and fit for the service in which she was engaged.

. . . .

FOURTH: The foregoing cargo losses, deaths and personal injuries were not caused by or due to any fault or neglect or want of care on the part of complainant or on the part of the S/S EURYPYLUS or those in charge of her, or of any person or persons for whom complainant is or was responsible, but were caused as a result of a fire which the vessel could not withstand despite her seaworthy condition and the proper seamanship displayed by her officers and crew.

FIFTH: The foregoing cargo losses, deaths and personal injuries were done, occasioned and occurred without the privity and knowledge of complainant and without the privity or knowledge, at or prior to the commencement of the voyage upon which the S/S EURYPYLUS was then engaged, of her master or of complainant's superintendents or managing agents.

Complaint of Ta Chi Navigation (Panama) Corp., S.A., at 1–2 (emphasis added).

In their answer, the cargo claimants put certain of these affirmative allegations in issue. In particular they denied the allegations of Paragraphs Fourth and Fifth and denied knowledge or information of Paragraph Second, except for the allegations as to the place where the vessel was built and her registry. Answer of Rohm & Haas & Co., ¶¶ 2, 4 & 5. However, in the *claims* filed by the cargo claimants seeking damages, they *affirmatively* alleged that the vessel "sailed on the intended voyage in an unseaworthy condition, with the full knowledge and privity of [the shipowner]." Claim of Rohm & Haas & Co., ¶ 5. A similar affirmative claim was made by the other claimant. *See* Answer of Citibank N.A., ¶ 14.

It would appear from the pleadings that the shipowner believed it had at least the burden of making out a prima facie case of seaworthiness in its claim for *exoneration* or limitation, whereas cargo claimants recognized in their claims for damages their duty of proving unseaworthiness and knowledge and privity. Accordingly, it is important to note that the Court was only trying the limitation or exoneration case, not the claims for damages.

The Court respectfully suggests that in a limitation or exoneration proceeding, where the petitioner shipowner is seeking affirmative relief—even in cases involving the Fire Statute—the petitioner must at least make out a prima facie case that it exercised due diligence to make the ship seaworthy at the commencement of the voyage. The shipowner in the instant case assumed that it had a duty to make out such a prima facie

case, and commenced the trial by calling witnesses and introducing a great quantity of exhibits such as ship plans, inspection reports, depositions showing inspections, fire drills, and other facts known to it which might have a bearing on the cause of loss. Moreover, petitioner's attorney referred to all of this as its prima facie case. Trial Transcript ("Tr.") at A 20.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REVIEWED

Although this Court, with all due respect, believes that it in fact did place on cargo claimants "the burden of proof of establishing either unseaworthiness or negligence causally related to the loss or damage," 504 F.Supp. at 229, it has nevertheless partially retried the issues to the extent suggested by the appellate court and reviewed the prior trial record. This Court again concludes that the cargo claimants have sustained the burden of proof: the S.S. EURYPYLUS was unseaworthy at the time she commenced her final voyage; the owner of the S.S. EURYPYLUS was negligent in keeping oxygen and acetylene cylinders stored outside the engine room; and the negligence was a substantial causative factor in the loss of or damage to her cargo. However, in view of an expression of opinion by the appellate court as to substantial evidence contrary to such a conclusion, which will be referred to in more detail hereinafter, it would appear advisable to go into greater detail than would otherwise be indicated.

This Court made comprehensive and specific findings of fact in its prior opinion. See 504 F.Supp. at 211–28. The Court will assume familiarity with such findings, and will repeat or summarize only the principal ones upon which it based its legal and factual conclusions.

S.S. EURYPYLUS, originally S.S. MANGLA, was built in Scotland in 1958 under the requirements of the 1948 Safety of Life at Sea Act Convention ("SOLAS") and the laws of the United Kingdom for merchant vessels. She was a steel general cargo vessel: length 497 feet; beam 63

feet; gross tonnage 8,601 tons; net tonnage 4,419 tons. Her plans were approved by Lloyd's Registry of Merchant Shipping with a 100A–1 classification. The vessel was equipped with two steam turbine engines. She had a 'tween deck running the length of the ship, and had six hatches on or above the main deck, three of which were forward of the midship accommodation house and three aft. The midship accommodation house occupied the full width of the ship and extended fore and aft approximately 148 feet. It rose some 42 feet from main deck level and was divided by three decks, i.e., the bridge deck, the promenade deck, and the boat deck. One level above the boat deck and forward of the boat deck was the navigating bridge structure, aft of which were the ship's funnel and ventilators. Just aft of and extending into the midship accommodation house forward to the engine room casing above the main deck was the refrigerating machinery room. The structure housing the refrigeration machinery rose to the level of the bridge deck, the top of the structure constituting a continuation or extension of that deck in the midship accommodation house. At the stern of the ship was the structure which contained the living accommodations for the crew, and directly below and slightly above 'tween deck level was the steering gear platform where the steering gear machinery was located. It was here that the diesel emergency fire pump was located, forward of the steering gear machinery and readily accessible by means of a ladder in the crew's accommodations on the main deck. Finding 4, 504 F.Supp. at 211–12.

The vital areas of the ship in this litigation were (1) the engine/boiler room (hereinafter the "engine room")—where the initial explosion occurred—which reached from the ship's bottom and terminated in the smokestack atop the uppermost deck of the midship accommodation house, and (2) the midship accommodation house, particularly the port "tonnage" alleyway, within that structure, on the main deck level—where the oxygen and acetylene cylinders were stored. The engine, boiler and other

equipment located therein have been· described in detail in the Court's prior opinion, see Finding 5, 504 F.Supp. at 212–13, as have the spaces of the midship accommodation house, see Finding 6, 504 F.Supp. at 213–16.

*The engine room* (actually an undivided space below the main deck) rose from two contiguous double bottom tanks on the ship's bottom on which were located three diesel generators. Some three feet above the base of these generators was the bottom or first level. Some 10 feet above the bottom level was the second level or maneuvering platform, which was slightly above the tops of the generators. Aft on the bulkhead was the main electric switchboard. Forward were the two main boilers, forward of which was the auxiliary boiler. About three feet above the second level or maneuvering platform was the third level (actually the lower 'tween deck). On the starboard side of the third level was the engine room workshop. Sixteen feet above the third level was the fourth level or main deck of the ship. Finding 5, 504 F.Supp. at 212–13.

Access to the engine room from without was effected on the main deck by a door on the port side opening into the port tonnage alleyway, *which door was always kept open,* Finding 59, 504 F.Supp. at 227, and a door aft on the port side leading into the cargo refrigerating machinery room which this Court believes was also open at the time of the explosion. Access was also afforded by a door on the starboard side of the engine room on the bridge deck. Egress to the boat deck was through an escape hatch. The other access was effected through the shaft tunnel around the first level of the engine room. This tunnel ran above the shaft from the casing of the engine room aft about 160 feet where it connected by ladder and stairway with the living accommodations of the crew in the superstructure at the stern of the ship. Finding 5, 504 F.Supp. at 212–13. The entire engine room was protected by a casing .3 inch thick of riveted steel construction which was insulated and rose from the ship's bottom through the upper decks up

to the funnel atop the vessel. Finding 6, 504 F.Supp. at 216.

The engine room was ventilated by an arrangement of one exhaust and two inlet fans, electrically powered, which placed the space under constant pressure, *i.e.,* the inlet fans blew air into the engine room at approximately 1½ inches of water pressure while the exhaust system was at a pressure of ½ inch of water, so that the space was under a constant pressure of one inch of water. The intake of air was approximately 22,000–25,000 cubic feet per minute. Accordingly, if any of the doors to the casing were open, a massive flow of air would pass out through them. *Id.*

The midship accommodation house contained the living accommodations of the master, the ship's officers, and certain crew members (11 officers and 6 crew members). These accommodations have been described in detail in the Court's prior opinion. *Id.*

At main deck level one entered the accommodation house from forward on the ship through either of two doors in the forward bulkhead: one on the port side, the other on the starboard side. The starboard alleyway ran aft in a straight line some 135 feet terminating in open access to the main deck aft of the accommodation house. However, this open access had been closed by wooden planks fitted into steel channels. There were no living accommodations on the starboard side of the vessel contiguous to the starboard alleyway. *Id.*

The port tonnage alleyway, entered through a door on the port side of the forward bulkhead, differed from the starboard alleyway. The entrance led to the tonnage alleyway, but it also led to a passageway running parallel to and outboard of the tonnage alleyway. On the outboard side of this passageway were the living quarters of certain members of the crew. On the inboard side there were storage spaces and a paint shop. The bulkhead on both sides of this passageway was made of wood. The port tonnage alleyway itself was four feet wide and extended directly

aft in a straight line for approximately 90 feet where it turned outboard. *Id.*

Some 10 to 15 feet before the tonnage alleyway turned outboard there was a metal rack on its outboard side with 10 apertures approximately eight inches in diameter. The rack was used for the storage of oxygen, acetylene and possibly freon cylinders. This rack was approximately six feet forward of the door to the engine room on the inboard side. *Id.* There is no evidence of any other rack for the storage of the cylinders.

Before the alleyway turned outboard it was paralleled by another passageway outboard of the tonnage alleyway which led into living quarters and hospital space. After turning outboard the alleyway continued aft some 45 feet along the port side of the ship where there was access to the open main deck. Here, as in the case of the starboard tonnage alleyway, such access had been closed by wooden planks fitted into steel channels. *Id.*

Finally, in describing the accommodation house it is important to note that on the main deck level the house on its port and starboard sides was a continuation of the hull not open to the sea—in effect, part of the freeboard of the vessel.

The importance of the port tonnage alleyway cannot be overstated. Unlike the starboard alleyway which ran along the outboard side of the accommodation house, the port tonnage alleyway ran well within the structure of the accommodation house. Moreover, it contained the main arteries or controls of the ship's fire-fighting system.

There were two principal systems for fighting fire, a water system and a steam system. *See* Findings 7–10, 504 F.Supp. at 216–17. One portion of the fire water main ran along the overhead of the port tonnage alleyway. The steam smothering system could be operated from within the engine room or by remote controls on the outside. The only remote system that could be operated while the ship was underway was located in the port tonnage alleyway within a few feet of the cylinder storage rack.[4]

On October 4, 1975, seven filled oxygen cylinders, two filled acetylene cylinders, and 1,450 pounds of freon were loaded aboard at Keelung, Taiwan. Finding 25, 504 F.Supp. at 220. These were billed directly to petitioner, Ta Chi. *Id.* When the shipowner's fire expert boarded the ship in February 1976 he found twenty to twenty-four gas cylinders in the port tonnage alleyway. The shipowner has offered no explanation for the presence of the additional cylinders.[5] Finding 52, 504 F.Supp. at 226. An additional cylinder was found in the aft accommodation house. Claimant's Exh. 5, photos 61 & 62.

The dangerous qualities of oxygen and acetylene, separately or in combination, as found by this Court, are not disputed. Finding 53, 504 F.Supp. at 226. Nor is there a factual dispute as to the oxy-acety-

---

**4.** The ship's plans, the testimony of petitioner's witness Sidney Cook ("Cook"), Tr. at A 44, and the depositions of the ship's officers confirm that the remote controls in the port tonnage alleyway controlled the steam from the main boilers, while those in the starboard tonnage alleyway controlled steam from the auxiliary boiler. This boiler was not in operation at sea, and certainly not on November 10, 1975.

In addition to the remote controls for the steam smothering system, the water main ran through the port tonnage alleyway. This was ruptured by an exploding cylinder during the initial explosion. Also located in the port tonnage alleyway were the remote controls to the quick-closing valves of the fuel oil tanks, the pump for closing the shaft tunnel door, and the freon pipes running from the refrigeration machinery room to the refrigerated spaces.

**5.** The reason for the additional cylinders is quite evident. It is mentioned briefly in the Court's original opinion. See Finding 30, 504 F.Supp. at 221. For two weeks prior to the fire and explosion, the officers and crew had been engaged in work on the hawse or chain pipe on the forward deck so that all but one of the oxygen cylinders had been exhausted. *Id.* It was for this reason that the electrical welding outfit was used on November 10, 1975. *See* Petitioner's Exh. PPP, Deposition of First Engineer Cheng at 57–59. We only know what cylinders were taken aboard at Keelung on October 4, 1975. Petitioner's Exh. NN. There is no evidence as to what was taken aboard as ship's stores on or before October 2, 1975 at Kaoschiung, Taiwan which was her home port, or at Kobe, Japan, on or before October 23, 1975.

lene system as it was rigged on November 10, 1975 at the time of the explosion. Finding 30, 504 F.Supp. at 221.

The Court has reviewed the evidence regarding the explosions and fire and concludes that its factual findings are clearly supported by a preponderance of the credible evidence. The physical evidence alone, and with the reasonable inferences drawn therefrom, support the conclusions as to the cause and nature of the almost simultaneous explosions. *See* 504 F.Supp. at 231–33. What the Court stated in its original opinion were, and remain, its conclusions based upon a preponderance of the evidence clearly sufficient to satisfy the cargo claimants' burden of proof of establishing not only unseaworthiness but also *negligence* causally related to the loss or damage. Findings 51–60, 504 F.Supp. at 226–27, 233. As this Court previously stated:

The stowage of the oxygen and acetylene gas cylinders at the location and in the manner so stowed at the commencement of the voyage, and the presence of the additional cylinders for which no permanent stowage was provided, together with the foreseeability that in the event of fire in the engine room the cylinders would explode and destroy or seriously impede the ship's fire-fighting capability, were within the privity and knowledge and resulted from the *neglect* of the shipowner, Ta Chi.

Finding 60, 504 F.Supp. at 227 (emphasis added).

Petitioner has attempted to reargue the issue of its negligence on the assumption that the remand directed this Court to "review the evidence on the basis that the burden of proof is clearly on the cargo claimants to prove the petitioner's *negligence* using the traditional negligence burdens." Brief of Petitioner Ta Chi Navigation (Panama) Corp., S.A., on remand ("Petitioner's Brief"), at 1 (emphasis in original). As hereinbefore indicated, this Court recognized that the burden was on cargo claimants and it determined and has redetermined the issue of negligence and unseaworthiness on that basis. Petitioner raises the same arguments as were raised after the original trial. For example, it still maintains that the acetylene and oxygen bottles did not explode until some time after the initial explosion and fire in the engine room. The physical evidence is all to the contrary. *See* 504 F.Supp. at 231–33.

Furthermore, it is important to note that prior to the original trial in their answer to the shipowner's interrogatories cargo claimants set forth fifteen specifications of unseaworthiness or negligence, which have been set out in the margin.[6] These may be

---

6. The cargo claimants asserted the following in their answer:

1. The inspection of the auxiliary fire pump indicated that it was defective and/or inoperable in that the starter handle for the fire pump engaged with considerable difficulty due to the fact that it was missing a pawl. Also tests indicated that the fuel injectors for this pump were inoperable.

2. The reach rod for the suction valve for the emergency fire pump was broken and/or disconnected.

3. Firefighting stations in various sections of the ship were found to have defective hydrants rendering them inoperable in that they had broken or bent spindles and missing latches. Some of these fire stations were not equipped with hoses, nozzles and/or other appropriate firefighting appliances.

4. Oxygen and acetylene were stored at a point in the accommodation such that in the event of fire, firefighting activities would be hampered and the speed of fire travel and consequence were substantially increased and it was foreseeable that in the event bottles exploded, the fire main system would be irrevocably damaged and rendered useless.

5. With the exception of a steam smothering system for the cargo holds, the ship was not fitted with appropriate fixed firefighting systems.

6. Valve lockers for the steam smothering system did not contain the tools with which to operate them.

7. The engineroom did not contain the required quantity of firefighting sand.

8. Primary firefighting equipment was concentrated in an area such that in the event of fire in the engineroom, firefighting capabilities of the ship were substantially reduced.

9. The design of the vessel was such that an engineroom fire was not anticipated in that no fixed firefighting system of any kind protected the engineroom.

summarized as: (a) a defective emergency pump; (b) defective fire-fighting stations and hydrants; (c) insufficient or inappropriate fixed fire-fighting systems; (d) missing fire-fighting equipment; (e) the lack of any organized fire fighting; and (f) the improper location of the oxygen and acetylene storage. The Court, clearly imposing the burden of proof on cargo claimants, held that they had not met that burden with respect to these specifications except for the allegation concerning the storage of the oxygen and acetylene. The Court pointed out that were that storage proper, then the location of various controls to the fire-fighting systems was improper, so that in either event the ship was unseaworthy and Ta Chi negligent. See 504 F.Supp. at 235.

■ Thus, the Court reaffirms its previous holdings: the S.S. EURYPYLUS was unseaworthy; the cargo claimants have proved that it was negligent for the petitioner to store the oxygen and acetylene in the port tonnage alleyway; this act was done with the knowledge and privity of the petitioner; and it was this act that prevented the extinguishment of the fire. See 504 F.Supp. at 232–33.

### ISSUES ON REMAND

It would appear that the only new issues on remand are (1) whether the cargo claimants indeed met the burden of proof on the issue of negligence of the shipowner; and (2) whether the shipowner was aware of the oxygen and acetylene stowage at the time the voyage commenced, i.e., whether such stowage was due to the personal "design or neglect" or "fault or privity" of the shipowner.

There is no real dispute that, if there was negligence in the location of the cylinders,

it was due to the personal "design or neglect" or "fault or privity" of the petitioner. See Asbestos Corp., supra, 345 F.Supp. at 820. The circumstances of the stowage were well known to petitioner's managing agent and alter ego, as was the fact that the door to the engine room was always kept open. Findings 58 & 59, 504 F.Supp. at 227. No evidence to the contrary was offered by petitioner, nor has it contested such findings either on appeal or on remand.

Although this Court found—and still finds—that unseaworthiness and negligence were established by a clear preponderance of the evidence, the appellate court asserted that substantial evidence existed to support the conclusion that the oxygen and acetylene cylinders were properly stored. The court stated:

Cargo claimants produced two expert witnesses in support of their contention that the storage was improper. The shipowner produced substantial evidence to the contrary. That evidence showed that the ship was built in Scotland in 1958 and carried a 100 A–1 classification with Lloyds Register of Shipping from the time it was built, indicating thereby that the ship was of the best quality. There was also testimony that a storage rack for the oxygen and acetylene cylinders was installed in the alleyway when the ship was built. From time to time thereafter, the ship was checked by representatives of Lloyds, and safety equipment certificates were issued in accordance with Safety of Life at Sea regulations (SOFAS) [sic], which were prepared under the auspices of the Intergovernmental Maritime Consultive Organization (IMCO). One such inspection was made in April, 1972 while the *Eurypylus* was

---

10. The vessel was not equipped with a fire main hydrant on the aft side of the water tight shaft alley door.

11. No evidence of organized firefighting.

12. Inadequate number of foam units carried in engineroom.

13. There was no equipment on board the vessel to control steam from outside engineroom space to the engineroom to control a fire in the engineroom.

14. The design of the fire main system prohibited control of the system in the event that an engine or other fire extended in the accommodation area.

15. Ventilators were all open and some were frozen and not operative.

Answers to Interrogatories Propounded by Petitioner, Ta Chi on behalf of Claimants, Rohm & Haas & Co., *et al.,* filed August 9, 1977.

owned by Compania Maritima San Basilio, the company which sold the vessel to Ta Chi in 1974. Another inspection was made in April, 1974. In September, 1974, before the *Eurypylus* was delivered to Ta Chi, it was inspected by the United States Coast Guard to insure that it met safety requirements for carrying passengers. *See* 46 C.F.R. § 70.05–3(a)(1). Because Ta Chi was going to change the vessel's flag registry from Greek to Panamanian, still another survey was conducted by Lloyds just prior to the transfer of the ship in December 1974. In none of these inspections was the location of the oxygen and acetylene cylinders faulted.

Captain William Roden ["Roden"], a retired Coast Guard officer with twenty-one years of specialized service in marine safety inspection, testified that the storage location of the cylinders on the *Eurypylus* met the safety requirements of the United States Coast Guard. When asked his own expert opinion concerning such storage, Captain Roden said:

> My opinion is that the location that they are shown as being stowed on the diagram is quite proper and that were I to be making the decision on the storage, I would approve the storage in that position.

Frank Rushbrook ["Rushbrook"], appellant's other expert, testified that, if he had gone on the ship prior to the accident and seen the cylinders where they were, he "would have been quite happy with them." Both of the ship's experts testified that oxygen and acetylene cylinders are often found inside the engine room itself.

677 F.2d at 227.

In light of the above, the Court has carefully reviewed the trial record and exhibits, and, once again concludes that cargo claimants have met the burden of proof on the issues of negligence and unseaworthiness. A review of the evidence demonstrates that this is not a case where the evidence favored the petitioner, nor is this a case where the evidence was evenly balanced so that the allocation of the burden of proof would be decisive. The cargo claimants produced substantial evidence showing that petitioner was negligent and the S.S. EURYPYLUS unseaworthy. Although petitioner produced some evidence to the contrary, it was unable to rebut the contention that the oxygen and acetylene cylinders were improperly stowed. Indeed, much of the evidence produced by petitioner, which the appellate court focused on, does not support its position.

*Classification, Safety Certifications and Inspections.*

There is no question that the ship was built in Scotland in 1958 and carried a 100A–1 classification with Lloyd's Register of Shipping from the time it was built. Accordingly, we must look first to British regulations, if any, dealing with the stowage of the oxygen and acetylene cylinders.

Although petitioner's fact and expert witness, Cook, testified that the storage rack was installed in the alleyway when the ship was built in 1958, Tr. at A 505, he previously testified during the trial that he first became familiar with the ship when it was purchased by Marchessini Lines in 1971, some 13 years after construction, Tr. at A 34. Because the original plans show only seven small circles drawn in freehand without any identification the Court cannot accept the claim that the rack was disclosed in the original plan approved by the plan approval office of Lloyd's Register of Shipping. Petitioner's Exh. D; Claimants' Exhs. 1 & 3. Indeed, petitioner's attorney suggested that these small circles "were put in by a witness at a deposition" or "were inked in by someone, but I don't know who." Tr. at A 632. Petitioner concedes that "[t]he storage rack location was penciled in on the General Arrangement Plan by Ta Chi personnel when this litigation commenced to identify the location for trial counsel." Petitioner's Brief at 7. This was not disclosed when Exhibit D was offered in evidence. The Court therefore adheres to its holding that "[t]he rack and its identification obviously were added after the original plan was prepared." 504

F.Supp. at 234. Petitioner's statement that "[s]uch racks are never placed on the General Arrangement Plan by the architects at the time the plans are drawn up," Petitioner's Brief at 7, is not supported by a scintilla of evidence, and, more important, even if this were true, one can only ask how Lloyd's could have "approved" the placement of the rack.

Petitioner's attempt to establish that the stowage rack was located in accordance with criteria set forth by the British government, *see* British Department of Trade and Industry, Carriage of Dangerous Gas in Ships (the "Blue Book") and Lloyd's Register of Shipping is based on pure hearsay, or on no evidence whatsoever. Petitioner concedes that the Blue Book requires stowage away from living quarters. A photograph taken by petitioner's expert shows that exploding cylinders in the port tonnage alleyway blew a hole into the living quarters outboard of the passageway. Petitioner's Exh. OO, Photo 24. Moreover, even if the location of the storage rack beside the engine room door had been found to meet the applicable standard, it is pure conjecture to say that the architects or inspectors imagined that future owners would leave the engine room door permanently open.

 There is also no question that the ship was inspected and *safety equipment* certificates issued, at least every two years, in accordance with the 1960 SOLAS regulations. This Court so found. Findings 13 & 14, 504 F.Supp. at 218. However, certification by a classification society, a foreign government, or pursuant to SOLAS, does not, in itself, establish the seaworthiness of a ship or the lack of negli-

gence on the part of the shipowner. *See Asbestos Corp., supra,* 345 F.Supp. at 820 n. 7. Also, certification does not satisfy the shipowner's obligation of due diligence. The shipowner's duty to provide a seaworthy vessel is non-delegable. *Federazione Italiana Dei Corsorzi Agrari v. Mandask Compania de Vapores S.A.,* 388 F.2d 434 (2d Cir.), *cert. denied,* 393 U.S. 828, 89 S.Ct. 92, 21 L.Ed.2d 99 (1968).

In *Asbestos Corp.,* the ship's fire equipment satisfied French law and regulations, and the ship had been issued a safety certificate pursuant to SOLAS. The shipowner contended that the vessel's fire-fighting system was, as a result, presumptively adequate. The circuit court, however, disagreed. It held that "[s]ince [the shipowner] expressly agreed in the bills of lading to be bound by COGSA, the standard of seaworthiness prescribed in that Act is controlling." 480 F.2d at 671.[7] In other words, a trial court is required to make independent determinations of seaworthiness and negligence. As previously stated by this Court these determinations are "made by the court based on all the relevant circumstances developed from the testimony or depositions of witnesses, the opinions of expert witnesses, relevant documents and photographs, and related principles of reasonable safety precautions applicable to the shipping industry." 504 F.Supp. at 230. Since SOLAS is concerned with safety and fire-fighting equipment, the fact that the S.S. EURYPYLUS was issued a safety certificate pursuant to SOLAS is not probative on the issue of whether the petitioner was negligent in stowing the oxygen and acetylene cylinders in the port tonnage alleyway.[8]

7. In this case,
 [t]he bills of lading issued by Ta Peng for the cargo loaded aboard S.S. EURYPYLUS on this voyage were "subject to the provisions of the Carriage of Goods by Sea Act of the United States of America, approved April 16, 1936, which shall be deemed to be incorporated herein . . . .
Finding 24, 504 F.Supp. at 220 (footnote omitted).

8. It is essential to distinguish between inspections or surveys which focus on post-accident

measures and procedures, *i.e.,* lifesaving and fire-fighting, and those which focus on accident prevention. SOLAS, which has been adopted by a vast majority of the countries, including the United States of America, the United Kingdom, Greece, Liberia, Panama, and Norway, is concerned with safety equipment aboard ships to assure adequate lifesaving and fire-fighting capabilities. *See* Petitioner's Exh VV: G. Smart, *The Survey of Safety Equipment on Cargo Ships* (1970–71). Two types of reports are issued, one designated as SE–1, the other SE–2.

Likewise, the Court finds that the Coast Guard "inspection" in September 1974 has little probative value. This Court was in error in assuming that all foreign vessels are subject to Coast Guard inspection at United States ports if they carry passen-gers. Finding 54, 504 F.Supp. at 226. Such vessels are not subject to inspection if they carry a current SOLAS safety certificate. *See* 46 C.F.R. §§ 70.05–3(b)(1), 90.05–1(a)(1).[9] *See also* Petitioner's Exh. LLL which indicates that S.S. EURYPYLUS

The basic safety equipment report is the Record of Safety Equipment, SE–1. See Petitioner's Exh. UU. This document reflects the number and capacity of lifeboats and life rafts, life buoys and life jackets, vessel stability, rockets and signals, fire appliances in engine room and auxiliary spaces (including the emergency fire pump) and outside of such spaces, description and location of lifeboats, life rafts, etc. and davits, embarkation arrangements, navigation lights, signalling apparatus, and lifeboat and life raft equipment. *Id.*

The other report is the Renewal Survey, SE–2, which is prepared by the surveyor after checking the arrangements on board the ship and the particulars set forth in the ship's SE–1 report. See Petitioner's Exhs. QQ and BBB. In addition Cargo Ship Safety Equipment Certificates are issued under the authority of certain governments. See Petitioner's Exhs. RR, SS, and XX.

None of these surveys or check-off lists make any mention of oxygen or acetylene, although they do make reference to CO fire extinguishing systems requiring specifics as to number, capacity and location of cylinders. *See* Petitioner's Exh. UU.

The SOLAS forms were relevant and were given due weight by the Court when it found for petitioner on the charges of inadequate or missing fire-fighting equipment. They had no relevance to the number, capacity and location of the oxygen or acetylene cylinders. The Court, in determining the standards for enforcement of accident prevention, must look to the pertinent regulations, practices, or publications first, of the country where the ship was constructed, and failing such data, to the international standards of the principal maritime nations.

9. The Court in its original opinion stated that foreign cargo vessels are not subject to "Coast Guard regulations, 46 C.F.R. § 147.05–100, regarding the carriage of oxygen and acetylene as stores or ship's equipment" although they were "subject to inspection at United States ports if they carry passengers." Finding 54, 504 F.Supp. at 226. This finding as to inspection was based on the testimony of petitioner's experts—that of Captain Roden, and, to a lesser extent, that of Cook—neither of whom cited any United States Coast Guard regulations to support that conclusion. *See, infra,* discussion at 435–436. The Court is convinced that, insofar as inspections are concerned, it was in error and that, if in fact any inspection was made by the United States Coast Guard, it was gratuitous.

A foreign vessel, regardless of the number of passengers it carries, is not subject to the regulations governing the inspection of passenger vessels contained in Subchapter H, 46 C.F.R. §§ 70–78, if it is a "vessel of a foreign nation signatory to the International Convention for Safety of Life at Sea, 1960, and which has on board a current valid safety certificate." *Id.* at § 70.05–3(b)(1). As a cargo vessel carrying 12 or less passengers, S.S. EURYPYLUS was also exempt from the provisions of Subchapter I, relating to inspection and certification of Cargo and Miscellaneous Vessels, 46 C.F.R. §§ 90–98, since she had on board a valid current safety equipment certificate. *See id.* at § 90.05–1(a)(1). Additional inspection or certification provisions for "foreign vessels of novel design or construction," *id.* at §§ 70.05–3(c), 90.05–1(b), or vessels with accommodations for more than fifty persons that carry United States nationals, *id.* at § 70.05–3(e), were also clearly not applicable to the S.S. EURYPYLUS.

That there was never an authorized inspection on October 15, 1974, despite the testimony of Roden and Cook, is borne out by petitioner's own exhibits. Petitioner's Exhibit LLL is a Control Verification for Foreign Vessel dated October 15, 1974. It recites that S.S. EURYPYLUS was a vessel, carrying 72 officers and crew, with 12 passenger accommodations, in freight service, of 5,601 gross tons, owned by Compania Maritima San Basilio, S.A., Agent P.D. Marchessini & Co. (New York) Inc. of Greek registry, keel laid in 1958, and that Greece was a party to the International Convention for the Safety of Life at Sea, 1960. The document further verifies that the vessel was boarded as authorized by Chapter I, Regulation 19 of the International Convention for the Safety of Life at Sea, 1960 and found to have a Cargo Ship Safety Equipment Certificate which was issued by Lloyd's Registry of Shipping for Greece with an expiration date of April 8, 1976. The portion of the Control Verification dealing with cargo vessels of countries not parties to the 1960 SOLAS Convention and which reflects an examination of lifesaving equipment is left blank.

The Cargo Ship Safety Equipment Certificate to which the Coast Guard referred may well be that referred to in Petitioner's Exhibit BBB which recommends the issuance of a Safety Equipment Certificate and is dated April 9, 1974. What is clear to the Court is that the S.S. EURYPYLUS was never subject to inspection by the United States Coast Guard. She never carried more than 50 passengers and, according to petitioner, S.S. EURYPYLUS always carried a current SOLAS Safety Certificate from Lloyd's.

was boarded by the United States Coast Guard on October 15, 1974 to check the presence of a SOLAS certificate. No inspection is reported as having occurred.

This is not to say that an inspector in examining a *United States vessel* does not examine for fire hazards such as oil accumulations in bilges and machinery spaces, 46 C.F.R. §§ 71.25–45, 91.25–45, or that his authority is limited when it comes to conducting tests or inspections necessary to determine the safety and seaworthiness of United States vessels, *id.* at §§ 71.25–50, 91.25–50, or that bulk cargo or dangerous substances may not be subject to inspection on any vessel, *id.* at § 91.25–37. However, under the circumstances of the instant case, where the SOLAS certificate exempted the petitioner from a Coast Guard inspection, petitioner's reliance on the Coast Guard "inspection" of the oxy-acetylene system carries little, if any, weight. It is not that the Coast Guard regulations have no probative value, but only that an "inspection" by the Coast Guard pursuant to section 70.05–3(b)(1) or 90.05–1(a)(1) is not proof of approval by that agency of the stowage of the oxygen and acetylene on the S.S. EURYPYLUS.[10]

Petitioner's principal argument was and is based on the claim that United States ships are permitted to carry oxy-acetylene cylinders in the engine room. Such permission was hardly relevant since the cylinders in S.S. EURYPYLUS were stowed *outside* the engine room and thus outside of the reinforced heavily plated bulkheads of the engine room.[11]

However, insofar as United States vessels are concerned,

> [a]ll cylinders serving as containers of a compressed gas used as an article of stores on board vessels shall be stowed in accordance with the requirements shows in table, § 147.05–100. When not in use, cylinders shall be secured in a rack provided for this purpose. Cylinders shall be protected from all sources of heat and shall not be dropped, rolled or dragged on the deck. Cylinders shall not be used as a roller to transfer weighty objects. Heat from an open flame shall never be applied to a cylinder

---

**10.** In *Asbestos Corp., supra,* 480 F.2d at 671 n. 4, the court had occasion to remark on the weight to be given to a SOLAS Safety Certificate in that particular case.

> Actually it appears that the Marquette did not have to meet any requirements as to fire fighting equipment in order to be certified under SOLAS. The vessel was constructed when SOLAS (1929 Convention) did not have any such standards applicable to a vessel such as the Marquette. The standards adopted in 1948 do not apply to vessels "existing" before the Convention became effective. *The certificate here relied upon appears to be totally lacking in probative value.*
> (Emphasis added).

**11.** It is undisputed that the S.S. EURYPYLUS *did not store the acetylene and oxygen cylinders within but outside the engine room.* This is not a trivial distinction. And yet petitioner examined and cross-examined witnesses as if storage in the engine room was an issue in this case. Thus, the question whether United States cargo vessels or tankers could carry oxygen and/or acetylene in their engine rooms was deemed an issue, although of little relevance. As will be seen hereinafter, petitioner attempted to impeach one of cargo claimants' expert witnesses on the basis that he had surveyed a particular vessel, among 350 other surveys, several years before the original trial of this case and could not remember whether the oxygen and acetylene were in the engine room. As was developed on retrial the arrangement plan of that vessel was markedly and significantly different from that of S.S. EURYPYLUS. *See infra* discussion at 438–439.

Although the Court was not, and is not, obliged to decide that "issue" —that is, whether petitioner would have been negligent if it stowed acetylene and oxygen in the workshop of S.S. EURYPYLUS in reasonable quantities, in manageable bottles and with the door to the tonnage alleyway closed—it is clear that this would have been a far safer procedure than stowage in the port tonnage alleyway. The engine room in S.S. EURYPYLUS was reinforced steel, the workshop was 14 feet below main deck level, and fore and aft of the engine room there were large, insulated refrigeration holds. While the stowage of oxygen and acetylene on S.S. EURYPYLUS exposed the cylinders to the fire risks of the engine room, it deprived the vessel of the safety features of the armored enclosure of that space.

in an attempt to exhaust the contents thereof. *Id.* at § 147.04–3.

The table referred to above is set forth in 46 C.F.R. § 147.05–100 and reads in pertinent part as follows:

Table S—Classification: Ships' Stores and Supplies of a Dangerous Nature

| Descriptive name of article | Characteristic properties, precautions required, markings required | Label required | Required conditions for transportation | |
|---|---|---|---|---|
| | | | Cargo vessel | Passenger vessel |
| Acetylene (for use as burning or welding equipment). | Cylinders shall conform to DOT specifications and bear the mark DOT–8 and shall be fitted with valve protection cap. Guard against leaks as this gas is inflammable and explosive over a wide range of mixtures with air (3 to 75% for pure acetylene). <u>Cylinders have been known to explode from shock, such as dropping.</u> Acetylene gas is slightly lighter than air. Oil or other lubricant shall not be used on a valve or other fitting connecting to cylinders. | Red gas. | Stowage: In a cool ventilated location selected and supervised by the Chief Engineer with the knowledge and approval of the Master. (Protected from temperatures exceeding 100° F.). Stow upright, secured in a rack, with valve protection cap in place on cylinder when of a type requiring such cap. Cylinder shall be stowed in rack at all times, except when actually in use. Quantity limitations: Cargo vessels shall not have on board as stores more than 600 cu. ft. of acetylene at any time. | Stowage: In a cool ventilated location selected and supervised by the Chief Engineer with the knowledge and approval of the Master. (Protected from temperatures exceeding 100° F.). Stow upright, secured in a rack, with valve protection cap in place on cylinder when of a type requiring such cap. Cylinders shall be stowed in rack at all times except when actually in use. Quantity limitations: Passenger vessels navigating inland or coastwise waters shall not have on board as stores more than 300 cu. ft. of acetylene at any time. Passenger vessels going foreign or intercoastal shall not have on board as stores more than 600 cu. ft. of acetylene at any time. |

Table S—Classification: Ships' Stores and Supplies of a Dangerous Nature (cont'd)

| Descriptive name of article | Characteristic properties, precautions required, markings required | Label required | Required conditions for transportation | |
|---|---|---|---|---|
| | | | Cargo vessel | Passenger vessel |
| Oxygen | Cylinders shall conform to DOT requirements and shall be fitted with a valve protection cap. <u>Oxygen is a strong supporter of combustion and greatly accelerates fire. Oxygen under pressure may cause grease, oil and other readily combustible and finely divided substances to ignite. Colorless, odorless and tasteless. Slightly heavier than air. Oil or other lubricants shall not be used on a valve or other fitting connecting to cylinders.</u> | Green gas. | Stowage: In a cool ventilated location selected and supervised by the chief engineer with the knowledge and approval of the master. (Protected from temperatures exceeding 100° F.) Stow upright, secured in a rack, with a valve protection cap in place on cylinder. Cylinders shall be stowed in rack at all times, except when actually in use. Quantity limitations: Cargo vessels shall not have on board as ships' stores more than 3,000 cu. ft. of oxygen at any time. | Stowage: In a cool ventilated location selected and supervised by the chief engineer with the knowledge and approval of the master. (Protected from temperatures exceeding 100° F.) Stow upright, secured in a rack, with a valve protection cap in place on cylinder. Cylinders shall be stowed in rack at all times, except when actually in use. Quantity limitations: Passenger vessels navigating inland or coastwise waters shall not have on board as ships' stores more than 1,500 cu. ft. of oxygen at any time. Passenger vessels going foreign or intercoastal shall not have on board more than 3,000 cu. ft. of oxygen at any time. |

(Emphasis in original).

These regulations do not rebut the evidence produced by the cargo claimants that demonstrated that it was negligent for the petitioner to store oxygen and acetylene in the port tonnage alleyway in close proximity to the permanently opened engine room door. *See infra* discussion at 433–434. Furthermore, the requirement that the location of the cylinders on United States ships is to be "selected and supervised by the Chief Engineer with the knowledge and approval of the Master" —§ 147.05–100, Table S, *supra* —does not relieve the shipowner of responsibility since the shipowner has a non-delegable duty to make the ship seaworthy. Moreover, the evidence shows that neither the Master nor anybody else "selected" the location or approved it. According to petitioner, the rack was in place when the vessel was purchased.

The only other matter requiring comment is petitioner's contention, put forward after retrial, regarding the freon gas on the vessel. It is now insinuated that the ten to fourteen additional cylinders found in the port tonnage alleyway must have contained freon. Petitioner's Brief at 13–14. There is not an iota of evidence that freon cylinders were loaded aboard the vessel at the commencement of the voyage. The written evidence is to the contrary, showing only that freon was loaded in bulk. *See* Finding 6, 504 F.Supp. at 214, n. 4.

*Expert Witnesses*

The Court has again carefully considered the testimony of the expert witnesses, the opinions given, the basis for such opinions, and the qualifications and interests of the witnesses.

Petitioner called Rushbrook as its fire expert, and cargo claimants called John F. Connell ("Connell"). Both witnesses were well qualified.[12] Rushbrook first testified on petitioner's prima facie case and was recalled on its rebuttal case. Initially Rushbrook testified he was unable to determine the cause of the first explosion and fire based on his physical examination of the vessel and his reading of the depositions of the witnesses. Tr. at A 122. He believed that the initial explosion occurred in the lower part of the engine room and suggested an oil leak in the #1 generator, Tr. at A 129, although he admitted that there was no evidence of any leak in an oil line, Tr. at A 195. He admitted that the oxygen and acetylene contributed to the fire, Tr. at A 165; that manufacturers recommend separation of acetylene and oxygen when stored, and that he would recommend four or five feet between the cylinders, Tr. at A 165–166; that the nearest fire hydrant was aft of the rack and on the open deck, Tr. at A 168; and that he would have recommended the storage of oxygen and acetylene in housing on the after deck, Tr. at A 177–183.

When recalled by petitioner on rebuttal, Rushbrook testified primarily as to the cause of the explosion. He was asked on cross-examination whether the port tonnage alleyway was inside the accommodation, and replied "It is a question, really, of interpretation. Technically it is not in the

---

12. Both Rushbrook and Connell are obviously experts in fire fighting and prevention. Rushbrook, a fire consultant specializing in the marine side, had extensive experience in fighting ship fires. In 1970 he was awarded Commander of the Order of the British Empire for his services in fire fighting and training merchant navy personnel. He started a school for training firemen and merchant marine officers in ship fire fighting and prevention. In addition, he served as a Chief Fire Officer in London and as the Fire Master of the Southern Fire Brigade, which includes Edinburgh, Scotland and the seven surrounding counties. See Tr. at A 94–98.

Connell, also a consultant, is no less qualified. In 1972, when he left the New York City Fire Department, he was the most decorated fire marshall in the history of the department. He has investigated 50–60 shipboard fires and was in charge of the construction of four merchant seamen fire fighting schools for the United States Maritime Administration. He lectures extensively and has attended numerous courses in fire science and technology at major universities and colleges in the United States and the United Kingdom. He also has a law degree from St. John's University. See Tr. at A 223–32.

accommodation, because it is totally separate. This engine room is unique, in my experience, in that that alleyway was totally separated from any living accommodation by a second steel bulkhead. So that, in that sense, technically, it is not in the accommodation, but within the configuration of the center housing, yes, it must be in the accommodation." Tr. at A 597–598.

Connell, testifying in support of the cargo claimants' charges of negligence and unseaworthiness, was examined and cross-examined at great length. Tr. at A 223–480. His opinion—that the cause of the fire was due to an initial explosion of oxygen and/or acetylene in the engine room followed almost immediately by a major explosion of the oxygen and acetylene cylinders in the port tonnage alleyway—was adopted by this Court after a careful examination of the depositions of officers and members of the crew and the numerous photographs placed in evidence by petitioner and claimants. Since this is fully set forth in the Court's earlier opinion, it is not repeated here, but strongly reaffirmed as supported by a clear preponderance of the evidence. Findings 31–38; 504 F.Supp. at 222–24, 231–33.

While there was evidence to support many of the allegations of negligence or unseaworthiness made by claimants, there was either substantial evidence introduced by petitioner to the contrary, or there was a lack of proof of causation. Even assuming failures in fire fighting or in the fire-fighting systems, once the cylinders exploded, neither competent ship's fire-fighting personnel nor adequate equipment could have controlled the conflagration. Both Rushbrook and Connell agreed on this point and their testimony on this subject was quoted at length in this Court's original opinion. *Id.* at 237–40.

As to the propriety of the stowage of the cylinders, Connell was the more impressive and convincing of the two fire experts.

Connell, like Rushbrook, was asked his opinion as to the stowage:

Q Do you have an opinion with respect to the propriety of stowing oxygen and acetylene bottles in the locations where they were stowed on the Eurypylus?

A Yes, sir.

Q What is your opinion?

. . . .

A I think that the bottles were stowed in such a position that in the event of an accident, and I must stress that accidents with acetylene are foreseeable and that is why there are strict regulations regarding acetylene, all over, on land and on sea—that the situs of the bottles of acetylene and oxygen were such that if an accident occurred involving these bottles, the engine room would be involved and crippled, the fire would be into the accommodation, the fire main system would be put out of operation from the inception, the steam smothering valve for the engine room on the port side would be inaccessible, and the main fire main control valves, one deck up, would be in danger, as they were in this case.

The alleyway in which they were located collapsed at the time of the explosion.

For those reason[s], I feel that that was the worst place on the ship that one could have stowed these dangerous materials.

Tr. at 293–294.

His opinion as to the stowage was based not only on German and Norwegian regulations, Tr. at A 294, but also on British authority. His testimony was as follows:

Q Did you rely on any authorities in expressing your opinions?

A Yes, I did.

Q Would you tell us some of the authorities that you relied on?

A The book generally referred to as the Blue Book, published by the British Department of Trade and Industry,

called the Carriage of Dangerous Gas in Ships.

Q What particularly did you rely on in that book?

A At Section 8–A of main Section 2, it reads, "Poisonous and inflammable gasses, unless otherwise recommended, should be accepted for carriage on deck of cargo ships only. Substances in this class should generally be stowed in a well-ventilated space, away from living quarters.

"Receptacles for such gasses should be kept as cool as reasonably practicable during transit and should be stowed away from all sources of heat and sources of ignition.

"Leaking gas should be prevented from penetrating to any other part of the ship.

"The stowage should be so arranged at all times that flammable gasses of Class 2 are kept separated from oxidizing substances.

"Inflammable gasses must at all times be stowed away from living quarters."

Now, under acetylene specifically, it describes it as a dissolved gas, explosive with about 2 percent to 80 percent in air, and it describes it as an inflammable gas with a slight odor. It is lighter than air, 0.9, it is carried in cylinders containing a solvent, usually acetone, and a porous mass. Rough handling and exposure to local forms of heating should be avoided. Results of such rough handling or heating may be delayed explosion. Empty cylinders must be carried with the same precautions as filled cylinders.

As for stowage, "Shade from radiant heat. Stow away from living quarters, on deck, in an area not accessible to unauthorized persons."

Tr. at A 298–300. He also quoted from the following authorities:

[Institute of Marine Engineers, *Chemicals in Ships* 83 (L. Kenworthy):] "Acetylene cylinders should be stored, preferably in an upright position, in a cool and well-ventilated space, not exposed to direct sunlight or other heat source. Gasses such as oxygen and compressed air should be stowed elsewhere. Master valves should be closed at all times unless work is in progress, and reduction valves should be carefully bled when work has finished."

. . . .

[Captain R.E. Thomas, *Stowage* 149:] "All compressed gasses expand rapidly with increase in temperature, and so expose the cylinders to danger of rupture. They should be stowed in a cool, well-ventilated place, and, if their nature calls for it, on deck, well away from living quarters and steam pipes and effectively protected from the sun's rays."

. . . .

[*The Welder's Guide* 828:] "Do not store oxygen and acetylene cylinders together. They should be separately grouped."

. . . .

[National Fire Protection Association, *The National Fire Codes* 51–8:] "Oxygen cylinders in storage shall be separated from fuel gas cylinders or combustible materials (especially oil or grease) by a minimum distance of 20 feet or by a noncombustible barrier at least five feet high having a fire-resistance rating of at least ½ hour."

. . . .

[National Fire Protection Association, *Inspection Manual* 180–81:] "Oxygen and acetylene, combined and burned in a suitable blow-pipe, produce a flame of approximately 6000 degrees Fahrenheit, hot enough to melt and fuse any of the commercially used metals.

Oxygen cylinders should not be stored near acetylene or fuel gas cylinders."

. . . .

[National Fire Protection Association, *Fire Protection Handbook* 7–29:] "Oxygen cylinders should be stored away

from readily combustible material. Inside buildings, oxygen cylinders either should be stored well away from acetylene or other fuel gas cylinders or separated from them by fire-resistive partitions."

Tr. at A 300–306.

Petitioner called two other witnesses as experts: Cook and Captain Roden. Cook first testified as a fact witness, on petitioner's prima facie case, describing S.S. EURYPYLUS, her purchase by Ta Chi, various inspections or surveys shortly prior to and in connection with the purchase, and other matters relevant to that purchase. Cook had been Marine Superintendent for Marchessini since 1954, and signed the conveyance of the vessel on behalf of his employer. He also testified that the tonnage alleyway was not part of the ship's accommodations, but made no mention of the oxygen-acetylene rack in the alleyway. Tr. at A 80–81.

He was also called by petitioner to testify as an expert concerning the location of the rack and the nature of the ship's structure and the tonnage alleyway.[13] He testified that there were no Lloyd's, United States Coast Guard, or Panamanian regulations as to the storage of oxygen and acetylene cylinders when used for ship's stores, Tr. at A 514, but that he believed the location of the rack was "the best possible place to be found," Tr. at A 516. He also testified that in October 1974 United States Coast Guard officials were aboard the S.S. EURYPYLUS. The officials were "interested in testing the automatic closing devices of the fuel oil tanks." Tr. at A 512. While they were on the ship they had to pass the cylinder rack in the tonnage alley-

way at which time, so far as Cook could recollect, "they passed a comment, 'O.K.' or something like this, which signified that there was no objection to the stowage of these bottles in this alleyway." Tr. at A 513. Yet according to his testimony, the Coast Guard officials went to the tonnage alleyway because they were interested in testing certain closing devices for the oil tanks, not because the oxygen and acetylene cylinders were there.[14]

Petitioner's third expert witness, Captain Roden, is a retired United States Coast Guard Captain with over 24 years of service primarily in marine safety and inspection. In fact, he ultimately became an Officer in Charge of Marine Inspection (OCMI). Tr. at A 599–600. Captain Roden identified Petitioner's Exhibit LLL as a control verification for a foreign vessel issued on October 15, 1974. He stated that if an owner, operator or representative made a request to carry passengers, the Coast Guard would assign inspectors to board the vessel to determine whether it was seaworthy in all respects for this purpose. He did not testify, however, that they would conduct an inspection if a SOLAS Safety Certificate was on board. He further testified that the Coast Guard had no specific regulations for the carriage aboard foreign cargo vessels of oxygen and acetylene as ships' stores. He cited the provisions of § 147.-05–100 as covering ships' stores and supplies of a dangerous nature aboard United States vessels. Although Captain Roden testified as to the procedure which would be followed in conducting an inspection before issuance of a verification certificate, the question as finally put to him was as to

---

13. Cook, during the period involved herein, was vice president, technical director, and marine superintendent of P.D. Marchessini & Company. In general he was in charge of the operation of its vessels. He had operated S.S. EURYPYLUS from April 1972 until her transfer to petitioner in December 1974. He was responsible for the delivery to petitioner according to the contract and signed the conveyance on behalf of Marchessini. "It was understood if anything was found wrong, we [Marchessini] would correct it." Tr. at A 542. Cook is presently in business

with Mr. Marchessini in a partnership, Union Marine, Inc. Tr. at A 485–486.

14. Petitioner offered no evidence to indicate the authority under which the Coast Guard officials were acting when they went to test the automatic closing devices of the fuel oil tanks. No Coast Guard report was introduced. Indeed, as previously noted, there is no evidence in the record that the Coast Guard inspected the S.S. EURYPYLUS for any purpose other than to check for the presence of a valid SOLAS certificate.

"the procedure ... that a U.S. Coast Guard inspector follows in inspecting a vessel," not a foreign vessel. Tr. at A 610. Indeed, when asked what the verification certificate attested to, he replied quite truthfully that "the vessel called the Eurypylus was in fact on 15 October, 1974 considered by the officer in charge of marine inspection to meet all the requirements that were necessary and in a seaworthy condition to proceed to sea with persons in addition to the crew." Tr. at A 616. Those requirements, set forth in 46 C.F.R. § 70.05–3 and § 90.05–1, were satisfied by the SOLAS safety certificate and exempted the vessel from certification and inspection.[15]

Finally, when asked for his opinion about the stowage of the oxygen and acetylene cylinders on board the S.S. EURYPYLUS on November 10, 1975, he replied "that the location that they are shown as being stowed on the diagram is quite proper and that were I to be making the decision on the storage, I would approve the storage in that position." Tr. at A 619.

His bases for such an opinion, on cross-examination, were that (a) the rack was a permanent structure, reflected in the original plans of the vessel; (b) it met the requirements of cargo vessel stowage; (c) stowage in the engine room was proper; and (d) the area was well ventilated. Tr. at A 625–629.

As noted, the rack, whether a permanent structure or not, was not reflected in the original plans of the vessel. This is an established fact. There is also no other evidence that it was officially approved at the time the vessel was classified. Nor did it meet any requirements of cargo vessel stowage. In his earlier testimony on direct, Captain Roden stated that acetylene stowed as cargo must be shaded from radiant heat, away from living quarters, on deck only. Tr. at A 606. Also oxygen and

acetylene must be stored in separate areas. Tr. at A 628.

As for ventilation, Captain Roden believed that the port tonnage alleyway was well ventilated, Tr. at A 625, despite the fact that he was asked to assume that the doors forward, which led into both the starboard and port tonnage alleyways, were closed and the openings port and starboard aft were closed with shifting boards. See *supra* discussion at 424. One has only to examine the meandering course of the port tonnage alleyway to conclude that there was little likelihood of adequate ventilation from without the accommodation structure. See Finding 6, 504 F.Supp. at 213–14. The Court believes that there was ventilation through the open door to the engine room. This was not mentioned by Captain Roden, and therefore does not add any support to his opinion.

As for stowage in the engine room, this had little relevance to storage outside the engine room. Moreover, Captain Roden was not certain how many cylinders could properly be stored in the engine room, Tr. at A 629–630, and, when asked whether he would approve the stowage of twenty to twenty-four bottles of oxygen and freon in the port tonnage alleyway of the S.S. EURYPYLUS with one rack which held ten bottles, his answer was "No." Tr. at A 635. Furthermore, he did not know how many cubic feet of compressed acetylene were in a cylinder. Tr. at A 647. How, then, could he have enforced his own Coast Guard regulations limiting the carriage of acetylene as stores to six hundred cubic feet? *See* 46 C.F.R. § 147.05–100, Table S.

The other expert witness called by cargo claimants was Helmut Schnitger ("Schnitger").[16] Schnitger had served as an engineering officer for 16 years, had been port engineer in Hamburg, Germany, for 6 years and had been a non-exclusive surveyor for Germanisher Lloyd in New York for

---

**15.** See *supra* note 9.

**16.** The only mention of Schnitger in this Court's prior opinion was in his capacity as an independent surveyor and his testimony that in such capacity he would not approve the oxy-acetylene

stowage on S.S. EURYPYLUS "because the international standard is that oxygen and acetylene cylinders are not to be stored or stowed *within the accommodation area.*" 504 F.Supp. at 234 (emphasis added) (citation omitted).

7 years. As a surveyor he had examined all types of vessels, under all flags, and had conducted approximately 2,400 surveys, including some 350 safety equipment surveys. He testified that after examining the arrangement plan of the S.S. EURYPYLUS, Petitioner's Exh. D, and the photographs of the vessel taken by Connell, Claimants' Exh. 5, photos 1, 4, 5, 6 & 19, he concluded that the port tonnage alleyway was part of the accommodation of the S.S. EURYPYLUS. Tr. at A 657–658. He was then asked whether, as a non-exclusive surveyor (*i.e.*, not bound to Germanisher Lloyd), he used any particular forms. He responded by identifying survey forms which were used on board vessels under the German flag, Tr. at A 658; *see* Claimants' Exhs. 19 & 20, and which were written both in German and English. On page 11, item XI of claimants' Exhibit 20—the SBG (German Safety Board or SEE–BE-RUFSGENOSSENSCHAFT) mutual survey—there is a checkoff question: "Does the gas welding plant comply with the SBG memorandum?" A similar question appears in the SBG Periodical survey form, *see* Claimants' Exh. 19, at 6, XI. In connection with this question, a SBG publication, Accident Prevention Regulations, Claimants' Exh. 21, was received in evidence, and Schnitger read from paragraph 88 on page 50 of that exhibit. The entire exhibit was in English. *See* Tr. at A 663; Claimants' Exh. 21. It was language from this paragraph that the Court excerpted and included in its findings of fact in its prior opinion. *See* Finding 54, 504 F.Supp. at 226. All of these exhibits, *i.e.*, Claimants' Exhibits 19, 20, 21 and 22, were received without objection, except for an objection by petitioner's counsel that the only portion of Exhibit 22 that had been translated into English was a paragraph read into evidence. Tr. at A 665.

In its opinion remanding the case, the court of appeals stated that "it was error to admit these regulations and to allow Schnitger to testify to them without requiring the shippers first to provide an independent English translation of all relevant portions of the book." 677 F.2d at 230. Cargo claimants have complied. See Claimants' Exh. 23. There was no further matter of relevance in Claimants' Exhibit 22 not already translated. Transcript on Remand Hearing ("Remand Hearing") on October 13, 1982, at 7–12.[17]

Schnitger also testified that where vessels were flying a "flag of convenience," *e.g.*, Panamanian or Liberian, he, as a surveyor, would apply either the rules of the safety board of the nation where the vessel was constructed—usually England, Germany, Norway, or the United States—or what he referred to as the normal international standard. That standard states that oxygen and acetylene are not to be stored or stowed within the accommodation area. Tr. at A 660–661, 675–676. He also testified that the Norwegian Safety Board, representing De Norske Veritas, would not permit storage within the superstructure of a vessel. Tr. at A 667–668.[18]

Schnitger was asked for the first time on cross-examination whether he would approve storage of the cylinders in the engine room. Tr. at A 678. He replied that he would not approve this in view of the heat, and the risk involved in moving the cylinders back and forth from the engine room. Tr. at A 678–679.

Finally, petitioner's counsel questioned Schnitger about his survey of a vessel, the LEVANT CLIPPER, in September 1976. Tr. at A 688. Schnitger admitted such a survey and identified the vessel as classified with Germanisher Lloyd "under Panamanian flag" and that he "transferred the safety equipment certificate from Panama-

---

17. This Court's primary authority was, and is, the British Blue Book, *supra, see* Finding 54, 504 F.Supp. at 226. The fact that other maritime nations have similar standards is, of course, relevant.

18. Petitioner attempted to discredit this testimony by suggesting that these regulations were not in effect in 1975. Tr. at A 685–686. However, claimants' expert Connell had also referred to them in earlier testimony, see Tr. at A 294, and petitioner made no attempt to support its assertion by any evidence whatsoever.

nian to Liberian authorities." Tr. at A 688. He further testified that the vessel had had a valid safety certificate issued by Germanisher Lloyd. He was then asked where the oxygen and acetylene bottles were stored on the LEVANT CLIPPER when he surveyed it in September 1976, and he replied that he could not remember. Tr. at A 688.

The appellate court also faulted this Court for not permitting petitioner's attorney "to testify in rebuttal that Schnitger had approved the stowage of oxy-acetylene cylinders inside the engine room of [the LEVANT CLIPPER]." 677 F.2d at 230.[19] On remand, however, petitioner's attorney did not choose to testify, but instead deposed Captain Ercument Mergen ("Captain Mergen"), the captain of the LEVANT CLIPPER, in London, England on October 21, 1982. Petitioner's Exh. OOOO.

According to Captain Mergen, the LEVANT CLIPPER was built in Germany in 1959 and was purchased by Levant Clipper Navigation Inc., a company owned by Captain Mergen and formed for that purchase. *Id.* at 2, 20. Petitioner's attorney represented the company on the purchase of the vessel at a marshal's sale in Panama and was apparently familiar with the vessel. *Id.* at 4–6. At the time of purchase the ship was under the Liberian flag, but was soon shifted to the Panamanian flag. *Id.* at 6.[20]

The LEVANT CLIPPER was approximately 300 feet in length with two hatches forward and two hatches aft of the midship housing. The first level of the midship housing was an open area from bulkhead to bulkhead. *Id.* at 24–25. On the deck above were living accommodations. Significantly the engine room was in the after section of the ship, very close to the steer-

ing gear room. *Id.* at 22–23; Exh. 3 to Captain Mergen Deposition.

In September 1976, some months after purchase and after completion of at least two voyages under Captain Mergen, the LEVANT CLIPPER was brought to New York harbor for drydocking in New Jersey "to correct a few things," and for the annual survey, safety equipment certificate and the cargo gear certificate. *Id.* at 4–5. Captain Mergen contacted Schnitger, the Germanisher Lloyd surveyor, who came aboard and found many items of safety equipment missing. Orders were placed for replacements. Schnitger examined the engine room on several occasions. *Id.* at 8–11. With respect to the following questions about the stowage of oxygen and acetylene cylinders Captain Mergen gave these answers:

Q. Did Mr. Schnitger inspect the engine-room on the Levant Clipper when it was in New York in September, 1976?

A. Many times, yes.

Q. Did the Levant Clipper carry oxygen acetylene bottles on board the vessel?

A. Yes.

Q. Where were the oxygen acetylene bottles stowed on the Levant Clipper when Mr. Schnitger did his inspection in New York in September, 1976?

A. I cannot say that when Mr. Schnitger inspected the vessel, but as far as I know the oxygen acetylene tubes are in the engine-room, second platform where there is a workshop and in the workshop there is a spot for them with clamps and they always stay there, those that are in use at that time. If the vessel is making a long voyage we

---

19. Although claimants' counsel requested that petitioner's counsel "remove his law firm as attorneys in this case," Tr. at A 689, if he testified, and objected because petitioner's counsel was not listed in the pre-trial order, the Court, while noting that the proposal was "very irregular," stated: "This goes to the matter of credibility and the Court can judge the credibility of the witness, and I would have to judge [petitioner's counsel's] credibility as well as [Schnitger's] because you certainly are an interested witness." Tr. at A 690. Petitioner's counsel responded

"Very well, your Honor" and on learning that the other parties had no further witnesses to call, rested his case. *Id.*

20. Apparently, there is some confusion in the record whether LEVANT CLIPPER was initially under a Panamanian or Liberian flag. See *supra* discussion at 43. In any case, such a determination is not significant to the main issues in this case.

always have some extras and for the extras we do not have a place in that room so we keep them in the vessel passageway, as we call it. We lash them over there and keep them over there.

When I was Master at one time I changed this situation and we started keeping part of the oxygen acetylene tubes in the steering gear because that passageway was far away from the engine-room and the workshop and during the bad weather we cannot take it down easily. Secondly, just on top of that passageway was accommodation.

*Id.* at 11–12.

In addition, Captain Mergen testified that there were three or four bottles in the workshop on a wooden platform with holes to fit the bottom of the cylinders and with a clamp about two-thirds up the cylinder to hold the cylinder in place. *Id.* at 13. About three or four spare cylinders were kept on the main deck in the area already described that Captain Mergen called a "passageway" but which was, in fact, an open area where there was no fixed installation. The cylinders were lashed with lines on the port or starboard side of this area depending upon which side was dockside on docking. *Id.* at 14–16. He testified the spare cylinders were on either the port or starboard side when Schnitger was aboard, and doesn't recall Schnitger saying anything about them. *Id.* at 15. He testified, however, that he never carried 20 cylinders at one time, indeed, never more than 4 oxygen and 2 acetylene cylinders, *id.* at 27, and that he never saw 24 cylinders on any ship, *id.* at 33. As he stated, "the normal practice is you should carry on board six bottles and say another couple of extras. That is what I have seen all my life at sea." *Id.* at 33.

On remand, petitioner called two witnesses in addition to Captain Mergen—Herbert J. Goodfried, a port engineer for Farrell Lines, Inc., and Ernie Ottespoor, a port engineer for Moore-McCormack Lines. These witnesses were called prior to taking the deposition of Captain Mergen. They were permitted to testify, but "limited to an attack on the credibility of Schnitger insofar as the Levant Clipper is concerned and nothing more." Remand Hearing at 19. One need only read the testimony of these two witnesses, *id.* at 21–56, to recognize it as an abuse of the remand. The testimony, which makes no mention of the LEVANT CLIPPER or of Schnitger, is devoted to petitioner's wholesale rebuttal of claimants' charges relating to the oxygen-acetylene storage aboard S.S. EURYPYLUS. While such testimony was as damaging as it was helpful to petitioner, the testimony and exhibits were stricken on motion of claimants. *Id.* at 55. It should be borne in mind that petitioner had already called three expert witnesses, compared to claimants' two witnesses. To accept the testimony of two further witnesses (in addition to that of Captain Mergen), none of whom were listed in the pre-trial order, would not only be inequitable, but a clear abuse of the Court's discretion with respect to cumulative or irrelevant evidence. As this Court stated:

It is perfectly obvious why they were called: to fill in some missing chinks in the case, and it has nothing whatsoever to do with the credibility of witnesses, generally with respect to the credibility of a lot of witnesses who expressed somewhat contrary opinions.

I was afraid this was going to be the device used, and if I permit that sort of testimony to go in, cargo could come in with witnesses from all over the world and have them testify with respect to particular vessels or vessels of particular shipowners.

*Id.* at 56.

## CONCLUSION

This Court has followed the guidelines laid down by the appellate court in this case, 677 F.2d at 229–30, and has again determined that the shipowner was negligent in preventing the extinguishment of the fire due to its stowage of secured and unsecured acetylene and oxygen cylinders in the port tonnage alleyway of S.S. EURY-

440

PYLUS. The standard for determining the negligence of the shipowner is whether it was reasonable in light of all the circumstances for it to store the cylinders in close proximity and vulnerable to a fire in the engine room. The "relevant circumstances [are] developed from the testimony or depositions of witnesses, the opinions of expert witnesses, relevant documents[, plans] and photographs, and related principles of reasonable safety precautions applicable to the shipping industry." 504 F.Supp. at 230. This is not an exercise in hindsight; the danger and frequency of engine room fires is well-known, as are the explosive qualities of acetylene and oxygen. No reasonable shipowner exercising foresight could view with equanimity the cylinders stowed in the rack, in the narrow tonnage alleyway, a few feet from a permanent opening into the engine room, nor could a reasonable shipowner, aware of the living quarters directly behind the rack and the vital fire-fighting controls or systems in the alleyway itself, fail to recognize the serious threat to life, to vessel, and to cargo. This has again been thoroughly considered by this Court which again concludes that by a clear preponderance of the evidence the petitioner was negligent and the vessel unseaworthy when she commenced the voyage. The privity and knowledge of the petitioner is not disputed.

Petitioner has the burden of proving what portion of damage to cargo could not have been averted even if the oxygen and acetylene cylinders had been stored outside of the midship accommodation house in compliance with British regulations and international standards. Since it has not done so it is liable for all damages. For the reasons set forth in the original opinion petitioner is not entitled to contribution from General Average.

The petition for exoneration or limitation is denied.

So ordered.