**CONTINENTAL GRAIN COMPANY, et al., Plaintiffs, Appellants,**

v.

**PUERTO RICO MARITIME SHIPPING AUTHORITY, et al., Defendants, Appellees.**

No. 91–1183.

United States Court of Appeals, First Circuit.

Heard July 30, 1991.

Decided Aug. 13, 1992.

Anthony J. Pruzinsky with whom Hill, Rivkins, Loesberg, O'Brien, Mulroy & Hayden, New York City, Antonio M. Bird, Jr., and Bird, Bird & Hestres, San Juan, P.R., were on brief, for plaintiffs, appellants.

Nicolas Jimenez with whom Patricia Garrity and Jimenez, Graffam & Lausell, San Juan, P.R., were on brief, for defendants, appellees.

Before BREYER, Chief Judge, SELYA, Circuit Judge, and YOUNG,* District Judge.

---

\* Of the District of Massachusetts, sitting by designation.

1. With apologies to Daniel Webster, Esq., arguing on behalf of Dartmouth College in *Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819). This portion of Webster's argument is quoted by Chauncey

## AMENDED OPINION

YOUNG, District Judge.

This case, arising under the admiralty and maritime jurisdiction of the District Court for the District of Puerto Rico, comes before this court upon appellants' appeal from the denial of their motion for summary judgment and the granting of appellees' cross-motion for summary judgment upon the counterclaim asserted against them. 755 F.Supp. 506 (1991). Unless otherwise noted, the facts are undisputed.

## I. FACTS AND PRIOR PROCEEDINGS

### A. General Background

"It is ... a small [merchant marine]. And yet there are those who love it!" [1]

In 1987, the entire merchant marine of Grenada consisted of a single, small cargo vessel, the M/V ALBATROS. Built in 1952 at Alphen Aan Den Rijn, Holland, the ALBATROS was a single screw, steel cargo vessel of 147.69 registered tons (299.30 gross tons), with a length of 131 feet, and a beam of 24 feet. She had a single cargo deck below two main deck hatches arranged fore and aft, and carried as crew a captain, a mate, an engineer, and three deck hands. Though designed for the shipment of grain in bulk, the ALBATROS was not equipped with shifting boards, lashing gear, or strapping materials to secure such cargo below deck. The Grenada Marketing National Import Board ("the Import Board"), a public corporation created by the Government of Grenada, owned the ALBATROS and made her available for charter commercially.

### B. The Loss of the ALBATROS

"It was sad,
  Oh it was sad,
It was sad when the great ship
  Went down ..." [2]

Goodrich in a November 25, 1852 letter to Rufus Choate, and is believed to be accurate. *See* John C. Sterling, *Daniel Webster and a Small College* 40–48 (1965).

2. Campfire song, *The Titanic.*

In December, 1986, the Import Board entered into an oral voyage charter contract with Continental Grain Company ("Continental") to carry corn and soybean meal in bulk from Guanica, Puerto Rico, to the islands of Guadeloupe and Martinique. Three such voyages followed without incident. On the fourth and final voyage, Continental directed the ALBATROS to Guanica, Puerto Rico, to load grain sold to it by its wholly owned subsidiary, Molinos Nacionales, Inc. ("Molinos"), for shipment to the other islands. Under its contract with Continental, Molinos provided the stevedoring services to load the cargo aboard the AL-BATROS, subcontracting a portion of the job to Luis Ayala Colon Successores, Inc. ("Ayala"), a Ponce stevedoring contractor.

For this fourth voyage, the cargo of grain was stored aboard the ALBATROS in the same manner as on the preceding three voyages. That is, though no loading survey had been made of the cargo and hold prior to loading, on January 12, 1987, two Molinos employees operated Molinos' shore-side grain loading equipment to move the bulk grain from Molinos' silo, along a conveyer belt, and through a flexible hose into the ALBATROS' single cargo hold. There it was trimmed by Ayala's men who raked it level. On the main deck, the AL-BATROS' engineer operated her single crane amidships, apparently to assist in positioning the grain hose. In this fashion, the ALBATROS took aboard 245.13 metric tons of corn and 80.36 metric tons of soy bean meal, all in bulk but separated by plastic sheeting by type of grain. Once the longshoremen had closed the hatches on the main deck, 998 bags of layer and broiler premix were stowed on deck in the following fashion: Molinos' employees brought the pallets on which the bags were stowed to the pierside where Ayala's longshoremen hooked them to the running tackle from the ship's crane. The ALBATROS' engineer then raised the pallet and swung it aboard where the Ayala longshoremen secured it on the main deck.

Although he had been absent from the vessel during the initial stages of loading, the master of the ALBATROS, Captain Benedict McLawrence, signed a Puerto Rico Maritime Shipping Authority short form bill of lading as a receipt for the grain cargo. Inspecting his vessel prior to putting to sea, Captain McLawrence found her to be riding on an even keel and, from reading the Plimsol marks, drawing an acceptable 8′ forward and 9′ aft. He did not, however, perform any stability calculations nor did he have aboard a stability book or other documentation from which he could have made such calculations. On the main deck, the crew of the ALBATROS rigged tarpaulins over the deck cargo and secured them to the hatches. The ALBATROS then cleared Guanica bound for Fort-de-France, Martinique.

Two days later, the ALBATROS ran into heavy weather some twenty miles off the coast of the island of Dominique. As the ship labored in choppy seas and winds of thirty to forty knots, below decks her cargo of free-flowing grain began to shift to port. As the ALBATROS developed a portside list, the shifting of the grain became inexorable. With the list increasing, Captain McLawrence ordered the ALBATROS' crew to abandon ship and get her people off. Eventually, the ALBATROS capsized and went down. Both the cargo of grain—and the entire merchant marine of Grenada—were thus totally lost.

### C. Prior Proceedings

"Well now they file their libels
And they cite Sir Walter Scott.
And the sailors say the French must pay;
Their counsel argues not." [3]

Apparently fully insured, Continental recovered the value of its cargo from its insurer, Eagle Star Insurance Company of America ("Eagle"). Continental, Molinos, and Eagle (collectively "the appellants") [4]

---

3. Arthur Sutherland, *The Ship Blaireau* (1954). *See, e.g., Church v. Hubbart,* 6 U.S. (2 Cranch) 187, 2 L.Ed. 249 (1804); *Mason v. The Ship Blaireau,* 6 U.S. (2 Cranch) 240, 2 L.Ed. 266 (1804).

4. Eagle, having paid Continental's loss, is subrogated to its claim and is thus the real party in interest on the complaint. Fed.R.Civ.P. 17(a).

then, *inter alia,* sued the Import Board as owner of the ALBATROS for the value of the lost cargo.[5] In its turn, the Import Board raised a counterclaim against Continental and Molinos, alleging that they were liable for the value of the ALBATROS when lost at sea. The parties having filed cross-motions for summary judgment on the issues of liability, the district court, in a thorough opinion, denied the appellants' motion and dismissed their complaint but granted the Import Board's cross-motion, thus ruling that Continental and Molinos were liable to the Import Board for the loss of the ALBATROS. Continental, Molinos, and Eagle bring this interlocutory appeal[6] challenging both the denial of their motion for summary judgment and the granting of the Import Board's cross-motion.

## II. ANALYSIS

At the outset, some general observations are in order concerning the nature of our review of this appeal, and the legal framework.

First, we note that the cross-motions for summary judgment from which this appeal is taken were filed at the conclusion of discovery and each motion is supported by copious evidentiary material. There is no reason to suppose any of the parties can adduce any additional evidence. The district judge thus had reason to believe that, in this jury-waived case, he had before him a full evidentiary record. His opinion is replete with numerous "findings" which suggest that the judge drew reasonable inferences based on the weight and persuasive character of this evidence.

■ The parties, however, did not bargain for any such innovative procedure; rather, they sought a resolution short of trial based on their individual motions for summary judgment.[7] Under this procedure, the trial judge makes rulings of law—rulings concerning whether, once all reasonable inferences are drawn *against* granting summary judgment, there exists any "genuine issue of material fact" as to which a trial is warranted. *See, e.g., Blanchard v. Peerless Ins. Co.,* 958 F.2d 483, 485 (1st Cir.1992); *Manarite, By and Through Manarite v. City of Springfield,* 957 F.2d 953, 955 (1st Cir.1992), *petition for cert. filed,* No. 91–8269 (May 12, 1992); *Lousararian v. Royal Caribbean Corp.,* 951 F.2d 7, 10, n. 4 (1st Cir.1991); *Space Master Int'l., Inc. v. City of Worcester,* 940 F.2d 16, 17 (1st Cir.1991); *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir. 1990). It is because summary judgment involves rulings of law alone that our re-

---

**5.** The original defendants also included the Puerto Rico Maritime Shipping Authority and Puerto Rico Marine Management, Inc., but the appellants dismissed the case as to these entities almost at once. Ayala was added as a defendant in the amended complaint but the district court dismissed the complaint as to it and no appeal has been taken therefrom. The remaining defendant, the government of Grenada, answered the complaint along with its Import Board and, raising no question of sovereign immunity, has defended the case in tandem with the Import Board. Since no one suggests the Import Board is other than a separate entity capable of suing and being sued in its own right, and since no ground for relief is advanced against the government of Grenada itself, the decision of the district court dismissing the action against Grenada is affirmed without further analysis.

**6.** Pursuant to 28 U.S.C. § 1292(a)(3) (1988), this Court has appellate jurisdiction because the order of the district court determined the rights and liabilities of the parties to this admiralty case. *See, e.g., Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified, Wrecked and Abandoned Steam Vessel,* 833 F.2d 1059, 1063–64 (1st Cir.1987); *St. Louis Shipbuilding & Steel Co. v. Petroleum Barge Co.,* 249 F.2d 905, 907 (8th Cir.1957).

**7.** As we have previously stated in *Boston Five Cents Sav. Bank v. Secretary of the Dep't of Housing and Urban Dev.,* 768 F.2d 5, 11–12 (1st Cir.1985), there was a procedural alternative to the filing of cross-motions for summary judgment. The parties could have stipulated that the district judge might decide the case based on the written record. Unlike filing cross-motions for summary judgment, stipulating a record for decision allows the judge to decide any significant issues of material fact that he discovers. *Id.* Thus, this procedure can result in the more efficient use of judicial resources. Therefore, for future guidance, we note that a district judge, in the appropriate case, may wish to draw counsel's attention to the availability of this alternative procedure and the limitations of the cross-motions for summary judgment procedure. *Id.* at 12.

view is plenary. *See, e.g., United States v. One Parcel of Real Property,* 960 F.2d 200, 204 (1st Cir.1992); *Pedraza v. Shell Oil Co.,* 942 F.2d 48, 50 (1st Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 993, 117 L.Ed.2d 154 (1992). Were it otherwise, i.e. had the judge here been engaged in fact finding after trial, naturally our review would be limited to the usual "clearly erroneous" standard. *See, e.g., McAllister v. United States,* 348 U.S. 19, 20, 75 S.Ct. 6, 7, 99 L.Ed. 20 (1954); *Puerto Rico Ports Auth. v. M/V Manhattan Prince,* 897 F.2d 1, 3 (1st Cir.1990).

Second, although appellants claim that the record is insufficient to determine the cause of the loss of the ALBATROS, we agree with the district court that on this record there is no genuine issue of material fact but that the shifting of the free-flowing grain to port in heavy seas caused first the portside list, then the progressive instability of the vessel, and ultimately her capsizing and sinking.[8]

The ultimate legal question may thus be simply posed—who is here responsible for a stow so unstable that in heavy weather it would shift so severely as to cause the vessel to capsize?

### A. The Loss of the Cargo

As one might expect, the duty to load, stow, trim, and ultimately discharge a vessel's cargo generally falls on the shipowner who also bears the consequences of any failure. *Nichimen Co. v. M.V. Farland,* 462 F.2d 319, 330 (2d Cir.1972). The parties are free, however, to alter the general rule by their private contract. Parties entering into charter contracts for private carriage of goods at sea[9] are free to allocate risks contractually either by express contractual provision, *see* R. Glenn Bauer, *Responsibilities of Owner and Charterer to Third Parties—Consequences Under Time and Voyage Charters,* 49 Tul.L.Rev. 995, 1012 (1975) (*"Time and Voyage Charters"*), or by allocating specific duties concerning the cargo and the voyage with the result that "the responsibility for cargo loss falls on the [party] who agreed to perform the duty involved." *Nissho–Iwai Co., Ltd. v. M/T Stolt Lion,* 617 F.2d 907, 914 (2d Cir.1980).

Here it is undisputed that Molinos and Ayala, the stevedore it hired, actually stowed and trimmed the cargo of grain aboard the ALBATROS. What's more, Molinos sold the grain to Continental under terms which provided "FOB stowed & trimmed Guanica"—terms which obligated Molinos to see to it that the grain was stowed and trimmed aboard the ALBATROS at no cost to Continental. Molinos is not a party to the oral voyage charter between Continental and the Import Board, however, and the terms of that contract are undeniably disputed. While Jose Martinez, a general agent for the Import Board, insists that Continental agreed to terms which provided "free-in-and-out-stowed-and-trimmed" ("FIOST"), Victor Swierad, Continental's agent in these negotiations, has a different version. Swierad was asked during his deposition, "Was anything said about who was to load and who was to unload?" He responded, "The thing is done on an FIO basis, free in and out.

---

8. This is fine as far as it goes, but it does not go very far. A host of questions is suggested by the parties but not definitively answered by the record. To pose but a few: What role did the absence of shifting boards, lashing gear, or strapping materials play in the loss and who, if anyone, should have procured and used them? What space remained between the trimmed but free-flowing grain and the deck above once the stow was finally complete? What role did this open space play in the loss? Should some of the bags of premix have been stored atop the grain to have prevented its shifting? *See United States v. Ultramar Shipping Co., Inc.,* 685 F.Supp. 887, 891 (S.D.N.Y.1987), *aff'd,* 854 F.2d 1315 (2d Cir.

1988). Would mathematical stability calculations made before the ALBATROS broke ground at Guanica have revealed an unsafe stow? See generally D. Thomas McCune, *For Want of a Nail: Causation in Marine Insurance—The Pervasive Determinant,* 66 Tul.L.Rev. 393 (1991), for a thorough discussion of causation issues.

9. The parties here do not challenge the careful analysis of the district court concluding that the oral charter contract in question was one for private carriage arising not out of the bill of lading but from the communications between the parties themselves interpreted as matter of federal law in light of their conduct. This Court adopts that same analysis.

That means that the vessel owner does not pay for loading or discharging costs." Appendix for Plaintiffs–Appellants, Swierad Deposition at 26a, 27a. Swierad backs up this deposition answer with an affidavit stating:

It was my understanding that the terms of this agreement were, quite simply, 'free in and out' (FIO). In any event, the entire sense of our agreement was that all expenses relating to loading and unloading the cargo would be for the account of Continental Grain Company as charterer. ... Mr. Martinez and I never discussed the allocation of risk in loading and unloading operations ...

Appendix for Plaintiffs–Appellants, Swierad Affidavit, ¶¶ 3–4.

The legal distinction between these versions is crucial. Martinez recalls agreement by Continental to FIOST terms while Swierad recalls only FIO terms, yet all parties agree with the legal analysis of the district court that, while both these common commercial voyage charter terms require the charterer to pay for loading and unloading, FIOST imposes the responsibility for and risks of stowage upon the charterer while FIO terms do not. *See generally* Braden Vandeventer, *Analysis of Basic Provisions of Voyage and Time Charter Parties*, 49 Tul.L.Rev. 806, 815 (1975) (pointing out that, in grain charters, the charter terms frequently place the risks of proper trim on the charterer).

As noted, the requisite standard for allowing summary judgment mirrors that invoked when considering whether to grant a directed verdict, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986), and mandates that all reasonable inferences be drawn in favor of the party opposing the grant of summary judgment. *See, e.g., One Parcel of Real Property*, 960 F.2d at 204; *Blanchard*, 958 F.2d at 491; *Manarite*, 957 F.2d at 955. Summary judgment is proper only if "there can be but one reasonable conclusion as to the verdict," *Liberty*

*Lobby*, 477 U.S. at 250, 106 S.Ct. at 2511, and the evidence is "so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2511–12. Summary judgment is improper wherever a "reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510. Such is the case here.

■ Whatever the indications from the surrounding facts and circumstances that Molinos and the stevedore of its selection actually loaded, stowed, and trimmed the grain aboard the ALBATROS pursuant to its contract with Continental—and the reasonable if not compelling inference that FIOST terms were operating as between Continental and the Import Board—the evidence from Swierad and the reasonable inferences that might be drawn from it bar the entry of summary judgment for the Import Board on the ground that it was contractually relieved of its general responsibility for stowage of the cargo. We are constrained to reverse the district judge on this point.

Having successfully warded off the imposition of summary judgment against them, the appellants go over to the offensive, advancing a series of arguments which, they say, mandated judgment on their behalf whatever the resolution of the FIOST–FIO contractual issue.

Appellants claim that the ALBATROS sailed in violation of Coast Guard safety regulations and the International Convention for Safety Of Life At Sea, June 17, 1960, 16 U.S.T. 185, T.I.A.S. No. 5780, reprinted in 6B *Benedict on Admiralty*, doc. 14–1 (Michael M. Cohen et al eds., 7th ed. 1991) ("SOLAS 1960").[10] These alleged violations, they argue, constitute negligence per se and, under the doctrine of *The Pennsylvania*, 86 U.S. (19 Wall.) 125 (1873), shift to the Import Board the burden of proving the lack of a causal connection between the violations and the loss of the ALBATROS and her cargo. Since the

---

**10.** Appellants' argument does not refer to the more recent Safety of Life at Sea Convention of 1974, 32 U.S.T. 47, T.I.A.S. No. 9700, *reprinted in* 6B *Benedict on Admiralty*, doc. 14–8, which sup-

planted SOLAS 1960. This distinction, however, is of no import because, with respect to those provisions relevant here, SOLAS of 1974 is the same as SOLAS of 1960.

record is devoid of undisputed evidence establishing such an analytic gap, the appellants claim summary judgment on their behalf. The district court rejected these contentions, holding that the ALBATROS was not subject to the requirements of either SOLAS or the Coast Guard regulations.

■ We agree with the district court's holding that the ALBATROS was not *directly* bound by the SOLAS Convention. Grenada is not a signatory to either the 1960 or 1974 SOLAS Convention. *See* 6B *Benedict on Admiralty,* docs. 14–1 at 14–13 to 14–35, 14–8 at 14–451 to 14–458.1 (listing nations which have ratified SOLAS of 1960 or SOLAS of 1974). Article II of SOLAS of 1974 provides:

Application

The present convention shall apply to ships entitled to fly the flag of States the Governments of which are Contracting Governments.

*Id.* doc. 14–8 at 14–50. Courts uniformly interpret the SOLAS Convention as applying only to signatories. *See, e.g., Alkmeon Naviera, S.A. v. M/V Marina L,* 633 F.2d 789, 793–94 (9th Cir.1980); *United States v. Ultramar Shipping Co., Inc.,* 685 F.Supp. 887, 891 (S.D.N.Y.1987). *Cf. Complaint of Ta Chi Navigation (Panama) Corp., S.A.,* 574 F.Supp. 418, 428–29, nn. 8–9 (S.D.N.Y.1983). Strictly speaking, then, the SOLAS Convention does not apply to the ALBATROS, a vessel flying the flag of Grenada.[11]

■ We disagree, however, with the district court's interpretation of the admittedly complex Coast Guard regulations for bulk grain carriers. We hold that these regulations do apply to the ALBATROS and hence we reverse the district court on this issue.

The United States shipping regulations in force in January, 1987, are found in Title 46 of the Code of Federal Regulations. *See*

46 C.F.R. §§ 1–587.9 (1986).[12] Chapter I thereof sets forth the Coast Guard, Department of Transportation Safety Regulations. 46 C.F.R. §§ 1–197.488. Subchapter I in its turn details the safety regulations applicable to cargo and miscellaneous vessels. 46 C.F.R. §§ 90–106.1101. This subchapter is comprised of twelve parts, including Part 93, entitled "Stability," which sets forth regulations governing the stability of cargo and marine vessels. Most relevant to our inquiry here, subpart 93.20, entitled "Bulk Grain Cargoes," lays out the provisions governing vessels carrying bulk grain cargoes.

There are two key provisions within subchapter I which indicate that subpart 93.20 applies to the ALBATROS. Part 90, the first part of subchapter I, sets forth the general provisions applicable throughout subchapter I. 46 C.F.R. §§ 90.01–90.35. With certain exceptions not relevant here, section 90.05–1, entitled "Vessels subject to requirements of this subchapter," provides that the safety regulations in subchapter I apply to "all United States flag vessels indicated in Column 5 of [the accompanying] Table 90–05–1(a) and to all such foreign vessels which carry 12 or less passengers from any port in the United States[.]" 46 C.F.R. § 90.05–1(a). In addition, with certain exceptions not relevant here, section 93.20–01, entitled "Application," provides that all provisions of subpart 93.20 "apply to all vessels that load grain in bulk after September 19, 1975[.]" 46 C.F.R. 93.-20–01.

It is undisputed that the ALBATROS was a foreign vessel carrying fewer than 12 passengers. Thus, under section 90.05–1, all parts of subchapter I, including Part 93, apply to the ALBATROS. *See Bach v. Trident Shipping Co.,* 708 F.Supp. 776, 779 n. 9 (E.D.La.1989) (pursuant to 46 C.F.R. § 90.05–1[a], a regulation in sub-

---

11. This is not to suggest, however, that some or all of the grain-carrying provisions of SOLAS may not be rendered applicable to the ALBATROS by express provision of the Coast Guard regulations. We believe 46 C.F.R. § 93.20–05 (1986) has precisely this effect. *See* pages 433–436, *infra.*

12. The provisions of 46 C.F.R. §§ 1–588.8 (1991), the shipping regulations now in effect, are in all relevant respects identical to the regulations effective in January, 1987.

chapter I applies to a foreign bulk cargo vessel flying the flag of the Cayman Islands, a nation not a signatory of SOLAS), *aff'd*, 920 F.2d 322 (5th Cir.), *vacated on other grounds*, —— U.S. ——, 111 S.Ct. 2253, 114 L.Ed.2d 706 (1991). It is also undisputed that the ALBATROS was loading grain in bulk on its last voyage in January, 1987. Thus, under section 93.20–01, the provisions in subpart 93.20 governing bulk grain cargoes apply to the ALBATROS.

The Import Board makes two arguments against this interpretation of the regulations. First, it argues that a correct reading of the enabling legislation for these regulations indicates that Congress had no intention to subject small foreign freight vessels like the ALBATROS to these regulations. Second, it contends that the language in section 90.05–1(a) was intended to cover foreign vessels carrying one to twelve passengers, not freight vessels carrying no passengers. Under this interpretation, subchapter I would not apply to the ALBATROS which carried no passengers. Brief for Appellees at 20–21. In our view, however, a careful examination of the enabling legislation refutes these arguments.

The authority for the regulations in Subchapter I, including 46 C.F.R. § 90.05–1, is found in Chapter 33 of Title 46 of the U.S.Code, entitled "Inspection Generally," 46 U.S.C. §§ 3301–3318 (1988). These statutory provisions are in all relevant respects identical to those in effect in January, 1987. More specifically, 46 U.S.C. § 3306(a) provides that "to secure the safety of individuals and property on board vessels subject to inspection, the Secretary [of Transportation] shall prescribe [the] necessary regulations" governing *inter alia* the operation of those vessels subject to inspection. The Import Board contends, however, that an examination of the related statutory provisions regarding vessel inspection, 46 U.S.C. §§ 3301–3318, "reveals that nowhere is it expressly provided that a cargo vessel of foreign registry, such as the ALBATROS is subject to inspection" (sic). Brief for Appellees at 15. Therefore, the Import Board argues, the regulations do not apply

to the ALBATROS because the ALBATROS did not constitute a vessel "subject to inspection." *Id.*

It is true that the relevant statutory provisions do not expressly state that *foreign* vessels are subject to inspection. Even so, our reading of the provisions of Chapter 33 taken as a whole convinces us that Congress intended foreign freight vessels such as the ALBATROS would be subject to inspection. Section 3301 of Chapter 46 lists "freight vessels" as one of the twelve categories of vessels subject to inspection under Chapter 33. Section 3302 sets forth a number of exemptions from the twelve categories, but does not exempt foreign vessels. Section 3303, entitled "Reciprocity for foreign vessels," provides in essence that a foreign vessel is subject only to a more limited inspection than the full inspection provided for under Chapter 33 where the foreign vessel is of a country which is a signatory of SOLAS, the vessel possesses an unexpired inspection certificate from that country, and that country's laws accord the same privilege to vessels of the United States. 46 U.S.C. § 3303(a). In addition, 46 U.S.C. § 3303(b) provides that the United States will charge foreign vessels carrying passengers from the United States the same amount in inspection fees as the foreign vessel's country charges United States vessels. If foreign vessels were not subject to inspection under 46 U.S.C. § 3301, it is unclear why Congress would include the provisions in section 3303. Furthermore, it should be stressed that the purpose of these inspection provisions is "to secure the safety of individuals and property on board vessels subject to inspection." 46 U.S.C. § 3306. The Import Board does not question the intent of Congress to assure the inspection of foreign *passenger* vessels even though 46 U.S.C. § 3301 expressly provides only for the inspection of "passenger vessels" with no explicit mention of foreign passenger vessels. Given the express legislative purpose of safeguarding property as well as individuals, we conclude that Congress intended to provide for the inspection of foreign freight vessels such as the ALBATROS.

Therefore, we read 46 C.F.R. § 90.05–1 as applying to foreign freight vessels carrying no passengers, such as the ALBATROS, and not only to foreign vessels carrying from one to twelve passengers.

The district court, citing 46 C.F.R. § 90.-05–10, entitled "Application to vessels on an international voyage," held that 46 C.F.R. § 93.20 did not apply to the ALBATROS. Section 90.05–10(a) provides in pertinent part that "the regulations in this subchapter [I] that apply to a vessel on an 'international voyage' apply to a vessel that ... [i]s mechanically propelled and of at least 500 gross tons[.]" The district court thus concluded that subchapter I did not apply to the ALBATROS, a vessel weighing far less than 500 gross tons.

Section 90.05–10, however, can properly be interpreted only when read in conjunction and in harmony with other relevant sections of the regulations. Most important in this regard is 46 C.F.R. § 2.01–8 (1986), entitled "Application of regulations to vessels or tankships on an international voyage." Section 2.01–8 is the general umbrella provision governing the applicability of all Chapter I regulations, *including* the subchapter I regulations for cargo and miscellaneous vessels. Section 2.01–8 provides as follows:

> (a) Where, in various places or portions of this chapter, requirements are stipulated specifically for "vessels on an international voyage" or "tankships on an international voyage," it is intended that these requirements apply only to vessels or tankships, as applicable, which are subject to the International Convention for Safety of Life at Sea, 1960.

(b) For details regarding application of Convention requirements to tankships, see § 30.01–6 of this chapter; to passenger vessels, see § 70.05–10 of this chapter; to cargo ships other than tankships, see § 90.05–10 of this chapter; and to small passenger vessels, see § 176.35–1 of this chapter.

This section indicates that where other provisions of Chapter I, including section 90.-05–10, refer to "vessels on an international voyage," these provisions are referring only to those vessels subject to SOLAS, not to all foreign vessels making international trips. It is undisputed that the ALBATROS was not subject to SOLAS. Therefore the ALBATROS was not a "vessel on an international voyage."

The fact that the words "international voyage" are placed in quotation marks in 46 C.F.R. § 90.05–10 further underscores that this section only applies to those *individual* regulations in subchapter I which specifically refer to "vessels on an international voyage." In fact, we count thirty separate provisions within subchapter I which specifically refer to "vessels on an international voyage." *See, e.g.,* 46 C.F.R. §§ 90.10–29, 91.01–25, 91.60–5, 94.10–5, 94.-10–10, 95.10–15, 95.15–5. None of the provisions in 46 C.F.R. § 93.20, however, makes any such express reference to "vessels on an international voyage." Thus, we are constrained to reverse the district court's ruling that 46 C.F.R. § 90.05–10 rendered the subpart 93.20 bulk grain loading regulations inapplicable to foreign vessels such as the ALBATROS which weighed less than 500 gross tons.[13]

---

13. We find further support for our interpretation of the applicability of the regulations in the 1976 edition of *General Information for Grain Loading,* a manual prepared by the National Cargo Bureau, Inc. and endorsed by the United States Coast Guard, reprinted in Appendix for Plaintiffs–Appellants at 299a–306a, 396a–398a. This manual provides guidance to shipowners, operators, masters, and others "for compliance with the various national and international regulations relative to the stowage and carriage of bulk grain." Appendix for Plaintiffs–Appellants at 299a. This manual is entitled to some weight because of the Coast Guard's endorsement and because the National Cargo Bureau, Inc. issues the documents of authorization and certificates

of loading as required by the bulk grain cargo regulations, 46 C.F.R. §§ 93.20–10 and 93.20–15.

The Preface to the 1976 edition of the manual indicates that 46 C.F.R. § 93.20–05 applies to foreign vessels not subject to SOLAS which load grain in bulk:

> The acceptance of loading arrangements based upon the 1960 Convention shall, in the case of foreign vessels, be limited to vessels belonging to countries which have formally accepted the 1960 SOLAS Convention ... with respect to grain stowage arrangements. Such foreign vessels are required to be provided with the stability and grain loading information prescribed by the 1960 Convention ...

Having determined that the Subpart 93.20 regulations apply to the ALBATROS, we now turn to an examination of what these regulations required and whether it is undisputed that the ALBATROS violated any of these requirements. The provisions of Subpart 93.20 dealing with documents of authorization, certificates of loading, and their absence are germane in the present circumstances.[14]

It is undisputed that the ALBATROS did not have and did not obtain either a document of authorization in accordance with Regulation 10, Part A of the Annex to International Maritime Organization Resolution A.264 (VIII) ("the Annex"),[15] as required by section 93.20–10, or a certificate

of loading as required by section 93.20–15. More importantly for our purposes, it also is undisputed that, contrary to section 93.-20–05(a), the vessel did not comply with Part B, section V(C) of the Annex, entitled "Ships Without Documents of Authorization," U.S. Coast Guard, *Circular No. 3–75* at 13. Part B, section V(C) sets forth the requirements with which a vessel must comply in order to load bulk grain if, like the ALBATROS, it does not have documents of authorization issued in accordance with Regulations 4 and 10 of Part A of the Annex. Pursuant to section V(C), the ALBATROS was required to secure the grain by use of strapping, lashing, or other cargo laid on top of the grain.[16] Therefore,

---

and approved by the country of registry. *All foreign vessels not meeting these conditions are required to be loaded in compliance with Title 46 CFR 93.20–05. In such cases reference should be made to IMCO Resolution A.264(VIII), Section V, Part C, (Vessels Without Documents of Authorization).*
Appendix for Plaintiffs–Appellants at 396a (emphasis added).

14. These provisions state:
§ 93.20–05  General.
(a) Each cargo vessel or barge that carries grain in bulk must comply with the Annex to International Maritime Organization (IMO, formerly Inter–Governmental Maritime Consultative Organization or IMCO) Resolution A.264 (VIII)....
(b) Notwithstanding the provisions of 46 CFR 56.50–50, bilges must be properly prepared and sounding pipes in place, clear and operable. If bilges are not present, suctions must be boxed.
(c) When calculating the minimum required metacentric height (GM), a free surface allowance must be made for slack liquids. The free surface allowance used must be equal to or greater than the free surface allowance for the following combination of tanks:
(1) The maximum free surface for the pair of tanks, port and starboard, of each type of consumable liquid, having the largest free surface.
(2) The maximum free surface of the fuel oil settlers.
(3) The free surface at 5 degrees heel for all fuel tanks assumed 98% full except for the pair considered in paragraph (c)(1) of this section.
§ 93.20–10  Document of authorization.
(a) Before it can load grain, each vessel that carries grain in bulk must have a document of authorization issued in accordance with one of the following:

(1) If the document of authorization is issued on or after September 19, 1975, Regulation 10, Part A of the Annex to IMO Resolution A.264 (VIII).
(2) If the document of authorization is issued before September 19, 1975,....
(b) The Commandant recognizes the National Cargo Bureau, Inc., ... for the purpose of issuing documents of authorization in accordance with paragraph (a)(1) of this section.
§ 93.20–15  Certificate of loading.
(a) Before it can sail, each vessel that carries grain in bulk must have a certificate of loading issued by an organization recognized by the Commandant for that purpose. The certificate of loading may be accepted as prima facie evidence of compliance with these regulations.
(b) The Commandant recognizes the National Cargo Bureau, Inc., ... for the purpose of issuing certificates of loading.

15. *See* Annex to Resolution A.264 (VIII) of the International Maritime Organization (IMO, formerly Inter–Governmental Maritime Consultative Organization), Part A, Regulation 10, November 20, 1973, *reprinted in* U.S. Coast Guard, *Navigation and Inspection Circular No. 3–75* 4 (August 20, 1975) ("*Circular 3–75*").

For citation purposes, when referring to specific provisions of the Annex, we will cite directly to U.S. Coast Guard, *Circular No. 3–75.* We note, however, that the Annex has been adopted in all relevant respects by the International Convention for Safety of Life at Sea [SOLAS] 1974, November 1, 1974, 32 U.S.T. 47, T.I.A.S. No. 9700, which is reprinted in 6B *Benedict on Admiralty* at doc. 14–18.

16. More precisely, section V(C)(c) of Part B provides that "[a]ll free grain surfaces in 'partly filled compartments' shall be trimmed level and secured in accordance with Section II of Part

we hold that, at a minimum, the Import Board violated the requirements of 46 C.F.R. §§ 93.20–05, –10, and –15.[17]

We next must consider the legal implications of these regulatory violations. Appellants assert that such violations of federal regulations in admiralty constitute negligence per se and trigger the application of the so-called Pennsylvania Rule. This rule, as first established by the Supreme Court in *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873), holds that:

> The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute.

*Id.* 86 U.S. at 136. This rule does not establish fault. It serves solely to shift the burden of proof on the issue of causation once a claimant has established that a vessel has violated a statute or regulation. *See* Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 13–2, at 452 (1987); Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* § 7–5, at 494 (2d ed. 1975). Furthermore, it does not shield the claimant from liability for contributory fault. *See* Schoenbaum, *Admiralty and Maritime Law* § 13–2, at 453.

While the Pennsylvania Rule was created in a collision case and is applied most commonly in such cases, courts also have applied it in cases involving allisions, collisions between a vessel and a stationary object, and vessel strandings. *See id.; see also Commonwealth of Puerto Rico v. SS Zoe Colocotroni*, 456 F.Supp. 1327, 1335 n. 20 (D.P.R.1978) ("The Pennsylvania Rule, although originally developed in connection with collision law, is applicable to strandings."), *aff'd in relevant part*, 628 F.2d 652 (1st Cir.1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981). Thus, in *SS Zoe Colocotroni*, where an oil tanker which ran aground was in violation of regulations governing navigational equipment, the court, applying the Pennsylvania Rule, employed "a presumption ... that these violations were a contributory cause of the disaster." *SS Zoe Colocotroni*, 456 F.Supp. at 1335. Given the policy underlying the rule, that is to assure strict compliance with rules pertaining to the safe operation of ships, we see no reason why the rule should not apply to the capsizing and sinking of a vessel as well as to a stranding.

Applying the Pennsylvania Rule, the Import Board has the burden of proving that its regulatory violations—most importantly its failure to comply with 46 C.F.R. § 93.-20–05 which was intended *inter alia* to assure that bulk grain stored in partially filled compartments is held securely—could not have been one of the causes of the sinking of the ALBATROS. Given the undisputed fact that it was the shifting of the free-flowing grain which caused the ALBATROS to sink, *see* pages 429–430, *supra*, the Import Board fails on the record before us to meet its burden of proving the lack of a causal connection.

---

C." U.S. Coast Guard, *Circular No. 3–75* at 13. Section II of Part C, entitled "Securing of Partly Filled Compartments," details three ways of securing grain in partly filled compartments: by the use of strapping or lashing; by the use of bagged grain or other suitable cargo placed on a separation cloth or a suitable platform on top of the grain; or by bagging the grain itself. *Id.* at 19–20. It is undisputed that the free-flowing grain did not entirely fill the hold and that none of the three permitted techniques were used to secure the grain. *See* McLawrence Deposition,

reprinted in Appendix for Plaintiffs–Appellants at 118a–119a; Stewe Deposition, *reprinted in* Appendix for Plaintiffs–Appellants at 211a.

**17.** Appellants also claim that the Import Board violated the regulations in numerous other ways. Having ruled that the shipping regulations are applicable, however, we need not extend this opinion inasmuch as there must be further proceedings in the district court.

Whether the Import Board is liable because of the application of the Pennsylvania Rule, and, if so, to what extent, hinges on the resolution of the FIO–FIOST issue. If it is determined that the charter party contract establishes FIOST terms, then Continental may have assumed all of the responsibility for and risk of stowage, thereby precluding any recovery from the ALBATROS for its statutory fault. Thus, if on remand FIOST terms are found to apply, the district court must then determine whether cargo damages should be apportioned based on relative fault or borne solely by Continental. On the other hand, if FIO terms are found to apply, then the Import Board is fully liable for the cargo loss, because of its regulatory violations.

Even without the aid of the burden-shifting rule of *The Pennsylvania*, however, the appellants argue that the undisputed record here so overwhelmingly indicates that the ALBATROS was unseaworthy at the time she set sail that, contrary to the ruling of the district judge, Eagle is entitled as matter of law to summary judgment against the Import Board for the value of the lost cargo. At first blush, this is a somewhat surprising argument since Eagle is subrogated to the rights of Continental and Continental—should FIOST terms ultimately be found to control—has undoubtedly breached its contract with the Import Board.

It may well be, however, that wholly apart from the terms of the charter party contract, the ALBATROS, loaded as she was and in violation of the bulk grain regulations, was unseaworthy when she broke ground at Guanica. *See, e.g., Oxford Paper Co. v. The Nidarholm*, 282 U.S. 681, 684, 51 S.Ct. 266, 267, 75 L.Ed. 614 (1931); *Olsen v. United States Shipping Co.*, 213 F. 18, 20–21 (2d Cir.1914). Even if she were unseaworthy, however, a trial remains necessary in order to ascertain the terms of the charter party contract. If FIOST terms controlled and obligated Continental to stow and trim, but its breach in that regard went uncorrected, and the ALBATROS sailed from Guanica in an unseaworthy condition, then the district court may see fit to apportion the damages.

■ Courts have held that "[w]here the charterer has assumed responsibility for stowage, however, and cargo damage is caused equally by unseaworthiness and bad stowage, the loss is divided." 2B *Benedict on Admiralty* § 4, at 1–29 to 1–30; *see also, Oxford Paper Co.*, 282 U.S. 681, 51 S.Ct. 266. (dividing damage to cargo between charterer and shipowner); *Coca Cola Co. v. S.S. Norholt*, 333 F.Supp. 946, 950–51 (S.D.N.Y.1971) (same); *Gator Marine Serv. Towing, Inc. v. J. Ray McDermott & Co.*, 651 F.2d 1096, 1100 (5th Cir. 1981) (apportioning damages to cargo between stevedore and shipowner based on comparative negligence); *Selcamerica, Inc. v. S.S. Barberbrook*, 390 F.Supp. 462, 467–69 (S.D.N.Y.1975) (apportioning damage to cargo between charterer and shipowner based on comparative negligence); Schoenbaum, *Admiralty and Maritime Law* § 10–12, at 403–04 ("In an appropriate case, damages may be apportioned between the parties."). *But see Olsen*, 213 F. 18, 20–21 (where charterer improperly stowed lumber on ship's deck rendering ship unstable and ship's master permitted vessel to sail in that condition thereby necessitating the subsequent jettison of some of the lumber, shipowner was held liable for the cargo loss without consideration of apportionment); see also Bauer, *Time and Voyage Charters*, at 1010, which concludes that "it is by no means clear that [these apportionment] cases ... are correct." Bauer argues that in a dispute between a charterer and a shipowner, the duty of the charterer is contractual and ought not be conflated with the tort doctrine applicable to joint tortfeasors. Bauer suggests that, in charterer-shipowner disputes, the claimant must show how much of the damages was caused otherwise than by the breach of contract before any apportionment is appropriate. *Id.* (citing *Government of Ceylon v. Chandris*, 2 Lloyd's List L.Rep. 204 [Q.B.] [1965]).

We draw out this analysis no further, however, since the district court must first determine whether, as a contractual mat-

ter, Continental had any duty whatsoever to stow the grain aboard the ALBATROS and, even if it did, whether, and to what extent, the seaworthiness *vel non* of the ALBATROS ought figure in any apportionment of the damages for the loss of the cargo.

### B. The Loss of the ALBATROS

Balked at obtaining summary judgment on their claim for reimbursement for the loss of the cargo, the appellants nevertheless press their contention that, in any event, Continental and Molinos cannot be considered liable for the loss of the AL-BATROS. In this, they fare somewhat better.

1. *The contract claim against Continental.* Continental argues that even if the factual dispute over the nature of the terms of the oral charter party contract were to be resolved against it and the terms were held to be FIOST, nevertheless Continental's breach of that contract, if any, forms no legal basis for the imposition of liability upon Continental for the loss of the ALBATROS. We agree.

■ Contract liability is a species of liability without fault and we have been cited no case—nor have we found any—where the mere failure to perform under the terms of a standard FIOST commercial shipping contract has exposed the shipper to contractual liability for the loss of the vessel. Nor is this surprising. Grain has been shipped at sea for thousands of years.[18] It is not an inherently dangerous cargo and its characteristics are well known. While a shipper and shipowner may theoretically have the freedom to contract that the shipper bears all the perils of the sea and *a fortiori* the more limited risks to the ship that stem from a shift in the stow, this risk is traditionally that of the shipowner who sends the vessel to sea. We rule that the standard FIOST grain shipment contract does not impose upon the shipper any contractual liability for the loss of the vessel, even when that loss results from a shift in the stow. A contrary rule would strikingly dilute the general obligation of the shipowner to provide a seaworthy ship—an obligation which, at least as to the charterer, cannot be delegated save by express provision. *See* Schoenbaum, *Admiralty and Maritime Law* § 4–5 at 134; Gilmore & Black, *The Law of Admiralty* § 4–5 at 209; *see also Oxford Paper Co.*, 282 U.S. at 684, 51 S.Ct. at 266.

2. *The claimed breach of warranty by Molinos.* Under *Ryan Stevedoring Co., Inc. v. Pan–Atlantic Steamship Corp.*, 350 U.S. 124, 132–34, 76 S.Ct. 232, 236–38, 100 L.Ed. 133 (1956), a stevedore owes to a shipowner a warranty of workmanlike service comparable to a manufacturer's warranty of workmanlike service that is of the essence of the stevedoring contract. Ruling that Molinos had breached this warranty by improperly stowing grain aboard the ALBATROS, the district court held Molinos liable for her loss. Molinos, supported by somewhat more recent authority in other circuits, argues that breach of the stevedore's warranty only creates liability for personal injury and not for damage to property such as the sinking of the ALBATROS.[19] *See, e.g., Phillips Petroleum Co.*

---

**18.** The carriage of grain by ship was central to the political economy and military strategy of ancient Rome. *See, e.g.,* Arthur D. Kahn, *The Education of Julius Caesar: A Biography, A Reconstruction* 26, 82, 116, 238 (1986); Colin Thubron, *The Ancient Mariners* 138, 149, 152–53 (1981); Julius Caesar, *The Battle for Gaul* 84 (Anne Wiseman & Peter Wiseman trans., 1980); Henry B. Culver & Gordon Grant, *The Book of Old Ships* 48–50 (1924). *See also* Emil Ludwig, *Cleopatra: The Story of a Queen* 53 (1937) ("Ninety Egyptian ships were burned at the foot of the Pharos, grain-ships among them.").

**19.** On the undisputed facts of record here, it requires drawing some factual inferences to conclude that Molinos—and not solely Ayala, the stevedoring contractor—held itself out as an expert and professional stevedore and had that degree of control over the loading operation which gives rise to the warranty. *See, e.g., Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., Inc.*, 376 U.S. 315, 322–24, 84 S.Ct. 748, 752–54, 11 L.Ed.2d 732 (1964); *Drago v. A/S Inger*, 194 F.Supp. 398, 410–11 (E.D.N.Y. 1961), *aff'd*, 305 F.2d 139 (2d Cir.), *cert. denied*, 371 U.S. 925, 83 S.Ct. 292, 9 L.Ed.2d 232 (1962). Since, in the summary judgment context, the inferences must be drawn against each of the moving parties in turn, *see Space Master Int'l, Inc. v. City of Worcester*, 940 F.2d 16, 17 (1st

*v. Stokes Oil Co. Inc.*, 863 F.2d 1250, 1255–57 (6th Cir.1988); *Bosnor, S.A. de C.V. v. Tug L.A. Barrios*, 796 F.2d 776, 784–86 (5th Cir.1986).

▮▮▮ We agree with the circuits which have most recently considered the issue. A shipowner owes a nondelegable duty of providing a seaworthy ship to her crew. Like a contract duty, this duty gives rise to liability wholly without fault. *See Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 498, 91 S.Ct. 514, 517, 27 L.Ed.2d 562 (1971); *see also* Schoenbaum, *Admiralty and Maritime Law* § 4–5 at 134. Even though unseaworthiness may arise from a "temporary and unforeseeable malfunction or failure of ... equipment," a shipowner is nevertheless liable. *Hubbard v. Faros Fisheries, Inc.*, 626 F.2d 196, 199 (1st Cir. 1980) (citing *Usner*, 400 U.S. at 499, 91 S.Ct. at 517). In 1956, when the Supreme Court decided *Ryan*, this nondelegable duty to provide a seaworthy ship extended to the longshoremen working aboard her. *See Ryan*, 350 U.S. at 127 n. 2, 76 S.Ct. at 234 n. 2. *Ryan* itself, of course, imposed warranty liability on a stevedore contractor to indemnify a shipowner against liability for causing personal injury to a longshoreman. Thus, where the shipowner was rendered liable to a longshoreman not because of some failure of the ship or its tackle but rather because the incompetence of the stevedore contractor rendered the ship unseaworthy, the *Ryan* rule insured substantial justice by requiring the stevedoring contractor to indemnify the shipowner for the liability it had caused that shipowner. *See Hobart v. Sohio Petroleum Co., Inc.*, 445 F.2d 435, 439 (5th Cir.) (citing *Italia Societa*, 376 U.S. 315, 84 S.Ct. 748), *cert. denied*, 404 U.S. 942, 92 S.Ct. 288, 30 L.Ed.2d 256 (1971).

The Longshore and Harbor Workers' Compensation Act Amendments of 1972, Pub.L. No. 92–576, 86 Stat. 1251 (codified as amended at 33 U.S.C. §§ 901–50 [1986]), changed this arrangement, legislatively limiting the liability of the shipowner to responsibility for its own negligence. *See Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1212 (5th Cir.1986). The earlier tripartite scheme of compensation without fault, viz. the longshoreman sues the shipowner for providing an unseaworthy ship and the shipowner in its turn impleads the stevedoring contractor for breach of the warranty of workmanlike service—and likewise the *Ryan* decision, the centerpiece of this arrangement—became outmoded and the *Ryan* decision is today little cited. *See id.* (referring to *Ryan* doctrine as "withered" doctrine); *see also Gator Marine Serv.*, 651 F.2d at 1100.

Against this background, we deem it improvident to apply the warranty liability created by *Ryan* to property damage claims against stevedoring contractors, at least in the undisputed circumstances of this case where the parties are sophisticated corporate entities whose very business purpose is to interact in these very seafaring premises. Such parties can best allocate risks as between themselves either by private contract or by the custom and usage of the trade. *Cf. Hanover Ins. Co. v. Puerto Rico Lighterage Co.*, 553 F.2d 728, 730 & n. 3 (1st Cir.1977) (declining to apply strict liability warranty doctrine to towage accidents because, unlike in personal injury cases, neither party resembles "the poor friendless sailor who is the traditional ward of the admiralty court"). Accordingly, we rule that Molinos is not liable to the Import Board on a breach of warranty theory, and reverse the decision of the district court on this point.

▮▮ 3. *Liability for the loss of the ALBATROS grounded on the negligence of Continental or Molinos.* The record here is wholly devoid of any basis for resort to a negligence theory to impose liability on Continental for the loss of the ALBATROS. Continental had no direct role in stowing the grain aboard the ALBATROS and there is not the slightest suggestion

Cir.1991), granting summary judgment on this ground would appear improper. In light of our view of the legal limitations on the reach of the stevedore's warranty of workmanlike service, however, it is immaterial what conclusions are drawn as to Molinos' status and we do not pursue the point.

440

that it was negligent in contracting with Molinos to perform those stevedoring services. The district court decision properly is not based on this ground. Since the Import Board bears the burden of proving the negligence of Continental, its failure in this regard requires the entry of at least partial summary judgment for Continental on this ground. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Accordingly, as there is no basis to hold Continental liable for the loss of the ALBATROS—as opposed to shouldering the risk of loss of its cargo of grain should FIOST terms be found to have been in effect here—Continental is ultimately to have judgment upon the counterclaim of the Import Board against it.

■ Molinos, however, may well have been negligent in the circumstances. Indeed, the facts from which its negligence can be inferred are largely if not entirely undisputed. We have already ruled, however, that the master of the ALBATROS was negligent for failing to comply with federal bulk grain cargo regulations, and that his negligence, imputed to the Import Board, was a contributory cause of the sinking of the ALBATROS. *See* pages 435–437, *supra.* What is required, therefore, is a trial regarding the alleged negligence of Molinos, and, should Molinos and McLawrence ultimately be found negligent, an analysis of what role that negligence ultimately played in causing the loss of the ALBATROS and her cargo. Since a trial is in the offing, we do not presume to anticipate the outcome and refrain from expressing any opinion thereon. It is for the district court in the first instance to fashion a rule of maritime law appropriate to these circumstances, recognizing that either or both the Import Board and Molinos may ultimately be found negligent.

### III.  CONCLUSION

The ruling of the district court dismissing the complaint as to Grenada is affirmed, albeit on grounds different from those advanced below. The decision of the district court is otherwise reversed and the case is remanded for trial of Eagle's contract, negligence, and unseaworthiness claims against the Import Board for the loss of the cargo of grain [20] and the Import Board's negligence counterclaim against Molinos for the loss of the ALBATROS. When the case is ultimately ripe for judgment—or earlier pursuant to Fed.R.Civ.P. 54(b) should the District Judge so determine—Continental is to have judgment dismissing the Import Board's counterclaims against it.

*Affirmed in part and reversed in part and remanded for further proceedings in accordance with this opinion. Each party shall bear its own costs.*

---

**20.** It is also open to the district court, should it deem it appropriate, to make further findings on the extent of the Import Board's negligence. *See supra* note 17.